## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| ARCONIC INC.,<br>201 Isabella Street<br>Pittsburgh, PA 15212 | : | CIVIL ACTION NO. _____ |
|  | : |  |
|           Plaintiff, | : |  |
|  | : |  |
|   vs. | : |  |
|  | : |  |
| NOVELIS INC.,<br>3560 Lennox Road<br>Two Alliance Center, Suite 2000<br>Atlanta, Georgia 30326 | : |  |
|  | : |  |
| **Serve:** Corporation Service Company<br>      40 Technology Parkway South<br>      Suite 300<br>      Ben Hill<br>      Norcross, Georgia 30092 | : |  |
| and | : |  |
| NOVELIS CORP.,<br>6060 Parkland Blvd.<br>Cleveland, Ohio 44124 | : |  |
|  | : |  |
| **Serve:** Corporation Service Company<br>      50 West Broad Street, Suite 1330<br>      Columbus, Ohio 43215 | : |  |
|  | : |  |
|           Defendants. | : |  |

## <u>COMPLAINT</u>

Plaintiff Arconic Inc. ("Arconic"), through Crowell & Moring LLP and Meyer, Unkovic, & Scott LLP, brings the following Complaint against Defendants Novelis Corp. and Novelis Inc. (collectively "Novelis"):

Over two decades and at great expense, Arconic researched and developed a highly valuable and proprietary process to treat aluminum (the "A951 process") that facilitates the widespread use of aluminum for automotive applications.  Indeed, with the recent acceptance of

A951™ treated aluminum into Ford Motor Company ("Ford") 150 series trucks – the best-selling trucks on the market – that revolution is already underway.

Novelis, a foreign-owned competitor of Arconic, presented its own solution to Ford. Ford rejected that solution. As the risk of losing its business with Ford grew, Novelis licensed elements of the A951 process from Arconic. Arconic disclosed certain elements of the A951 process to Novelis Corp. under a non-disclosure agreement and, later, to Novelis Inc. under a license deal with non-disclosure obligations. Both agreements have strict confidentiality obligations.

Instead of observing those obligations, Novelis brazenly applied for a patent application in its own name for elements of the A951 process, falsely asserting that two Novelis employees are the sole inventors. That application, which was published on November 3, 2016, disclosed some of the highly valuable trade secrets Arconic had entrusted to Novelis pursuant to the foregoing agreements. Arconic held Novelis' hand to teach them the A951 process in what was supposed to be a mutually beneficial relationship in support of a joint customer, and as a reward for that goodwill, Novelis took the egregious action of not only publishing Arconic's trade secrets for the world to see but claiming them as their own.

## PARTIES

1.     Arconic Inc. (formerly known as Alcoa Inc.) is a Pennsylvania corporation with its principal place of business in New York, New York. Arconic has its global corporate headquarters in downtown Pittsburgh and a facility outside of Pittsburgh, in New Kensington, Pennsylvania, both of which are in this District. Arconic is a publicly-traded company on the New York Stock Exchange.

2.     Defendant Novelis Inc. is a Canadian corporation with its principal place of

2

business in Atlanta, Georgia.  Novelis Inc. is a wholly-owned subsidiary of Hindalco Industries Ltd., which in turn is a wholly owned subsidiary of Aditya Birla Group, both of which are headquartered in Mumbai.

3.     Arconic and Novelis Inc. are parties to the Technology Access & License Agreement, with an effective date of August 15, 2012, and a subsequent amendment (hereinafter the "License").

4.     Defendant Novelis Corp. is a Texas corporation with its principal place of business in Cleveland, Ohio.  Novelis Corp. is a wholly-owned subsidiary of Novelis Inc.

5.     Arconic and Novelis Corp. are parties to a Confidentiality, Nondisclosure, and Limited Use Agreement, with an effective date of November 1, 2011, and a subsequent amendment (hereinafter the "NDA").

## JURISDICTION AND VENUE

6.     This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Arconic asserts federal claims under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831, et seq.  The Court also has supplemental or pendant jurisdiction over Arconic's remaining claims insofar as those claims form part of the same case or controversy as the federal question claims, pursuant to 28 U.S.C. § 1367.  In addition, this Court has diversity jurisdiction over this action under 28 U.S.C. § 1332.  The amount in controversy exceeds $75,000, exclusive of interest and costs.

7.     This Court has personal jurisdiction over Novelis Inc. and Novelis Corp. under principles of specific and general jurisdiction as they both do business in the Commonwealth of Pennsylvania and have engaged in the activities discussed herein in the Commonwealth of Pennsylvania.

8.      Venue in the Western District of Pennsylvania is appropriate under 28 U.S.C. § 1391(b)(2) as a substantial part of the actions giving rise to the claims herein occurred in this District.

9.      The NDA and License contain provisions stating the agreements shall be interpreted under "the laws of the Commonwealth of Pennsylvania" without regard to its conflict of law principles.

10.      The License contains an Allegheny County choice of forum clause.

11.      The NDA does not contain a forum selection clause, but was negotiated, signed (by Arconic), and performed in this District.

12.      The A951 process, which is at the center of this dispute, was developed at Arconic's facility outside of Pittsburgh and in this District.

## BACKGROUND FACTS

### Arconic Develops A951 Technology To Meet Market Needs For Fuel Efficiency And Bond Durability After Decades Of Efforts

13.      Arconic is an innovative leader providing engineered metallic, including aluminum, products and solutions to various industries, including the aerospace and automotive industries.

14.      Acceptance of aluminum for automotive structural applications has taken decades. Automotive manufacturers long used and designed their production lines for heavier materials such as steel.  Production lines can involve hundreds of millions of dollars in tooling and investments, and automotive applications can require large and reliable volumes of materials. Path dependency, therefore, has been a significant hurdle to the introduction of aluminum structural applications.

15.      With the advent of higher gas prices, fuel economy, environmental standards, and

greater manufacturer and consumer consciousness around these issues, manufacturers began to look more seriously at lighter-weight aluminum materials.

16.     Arconic, the market leader in new aluminum-based technology, saw these trends and began preparing for this massive opportunity decades ago.  As far back as the 1980s, Arconic – then Alcoa – was investing in automotive aluminum structural applications, while there was not yet a market for such applications.

17.     One challenge in switching to aluminum structural parts is achieving bondability. In automotive applications, the bonds between parts must last decades in extreme environmental conditions to be seriously considered by major manufacturers.  Some technology existed to improve the bondability of aluminum, such as Titanium Zirconium ("TiZr"), but it was doubtful that any would pass both the environmental and durability standards that automotive manufacturers would demand.

18.     Arconic saw the need for a new technology.  Arconic invested tens of millions of dollars and several decades to develop a revolutionary bonding technology – A951™ – that is more environmentally friendly and that produces adhesive joints of greater strength and durability than those made using traditional conversion coatings.

19.     After fifteen years of numerous smaller projects, Ford agreed to consider aluminum structural parts for its flagship Ford 150 truck, the best-selling truck in the world.

20.     Ford conducted extensive testing and determined that A951-treated aluminum was the only aluminum capable of meeting its requirements.  (Novelis proposed an alternative that was rejected.)  This qualification of A951-treated aluminum was the basis for Arconic and Ford to sign a long term supply agreement for A951-treated aluminum in 2011 and again in 2013.

21.     A951 was named one of R&D Magazine's top 100 technology innovations for 2014.

22.     Through its investments and persistence, Arconic was, as of the Ford agreement, positioned on the leading edge of the worldwide automotive adoption of aluminum.

23.     Ford wanted multiple sources of supply, and thus, required Arconic to license and share certain know-how with Novelis Inc. and Novelis Corp. under confidentiality agreements.

### Arconic Protects Its Trade Secrets and Confidential Information

24.     Arconic keeps its confidential information secret by employing several layers of security.  It requires all employees to enter employment agreements that contain nondisclosure provisions; it regularly disseminates policies regarding the secrecy of its information; and it restricts employee access to this information.  Any access to Arconic's email system and document storage system requires the input of an authorized identification name and associated password.  Arconic's files are also protected by physical security at storage sites, including the facility outside of Pittsburgh where A951 was developed, which restricts access without a company badge or identification, among other things.

25.     The trade secrets and other business information described above were acquired through countless hours of work by Arconic employees.  Absent a license, they are not known to Arconic's competitors and, thanks to the protections in place at Arconic, not readily ascertainable by others through proper means.

### Arconic Shares Certain Aspects of A951 Technology With Novelis To Facilitate Commercialization Under Strict Confidentiality Requirements

#### *Novelis Corp. Signs A Nondisclosure Agreement*

26.     On November 1, 2011, Arconic (then Alcoa) and Novelis Corp. entered into the "NDA," which was later amended. A true and correct copy of the NDA is attached hereto as

Exhibit 1.

27.     Thereunder, Arconic expressly reserved "rights worldwide in and to all improvements to [any] Samples to the extent relating to [Arconic's] 951 coating process made during the Term of this Agreement." Ex. A to NDA, §4(d).

28.     In addition, Novelis Corp. is prohibited from "analyz[ing] Samples for chemical composition or cause Samples to be analyzed for chemical composition" and agrees the "chemical composition of the Samples shall not be the subject of any test performed by or at the direction of Novelis." Ex. A to NDA, §4(a).

29.     Novelis Corp., as the receiving party, also agreed that it will "only use the Confidential Information in furtherance of the Relationship." Ex. A to NDA, §2(a).

30.     Novelis Corp., as the receiving party, further agreed that "[c]onfidential information will be received and maintained by [it] in confidence and except as set forth herein, not disclosed to third parties without the prior written consent of" Arconic, as the disclosing party. Ex. A to NDA, §2(b).

31.     Pursuant to the terms of the NDA, Novelis Corp., as the receiving party, agreed it would "exercise reasonable efforts to prevent third parties from gaining access to Confidential Information." Ex. A to NDA, §2(b).

32.     Novelis Corp. also accepted responsibility for "any breach of [the NDA] by its employees" or other third parties. Ex. A to NDA, §2(e).

33.     The NDA permitted "discussions and information shared between the Parties relating to [Arconic's] 951 coating process as provided on approximately 23 sample coils of Novelis aluminum sheet supplied by Novelis [Corp.] to [Arconic] for provision to a third-party customer and the supply by [Arconic] of 951 coating process chemicals to Novelis for use in

support of the Ford P552 Program." NDA at 1.

34.     The parties expressly agreed that the 951 coating process chemicals "are designated as Confidential Information.  The Chemicals may only be used by Novelis [Corp.] in connection with the Purpose." NDA at 1.

35.     The NDA prohibits Novelis Corp. from "analyz[ing] for chemical composition and Novelis acknowledges and agrees that the chemical composition of the Chemicals shall not be the subject of any chemical composition test performed by or at the direction of Novelis [Corp.]." NDA at 1-2.

36.     The term of the NDA is for one year unless terminated early by either party upon written notice. NDA at 2.

37.     The NDA states "[a]ll obligations of confidentiality, nondisclosure, and non-analysis under this Agreement will terminate five (5) years after the termination of this Agreement, but these obligations may be modified in a subsequent Technology Licensing Agreement as may be negotiated by and between the Parties."  NDA at 2.

*Novelis Inc. Signs A Licensing Agreement*

38.     On August 15, 2012, Arconic (then Alcoa) and Novelis Inc. entered into the License for A951™ technology, which was later amended.  A true and correct copy of the License is attached hereto as Exhibit 2.

39.     Thereunder, Novelis is expressly prohibited from "challeng[ing] the validity, status, and ownership by [Arconic] of the [Arconic] Technology and Know-How." License, §5.1.

40.     Pursuant to the terms of the License, Novelis is prohibited from "analyz[ing] the 951 Chemicals … for chemical composition … for purposes of reverse engineering for commercial production." License, §4.4.

41.     Novelis also agreed that it will "be responsible for any breach of this Agreement by its Representatives." License, §4.1.

42.     Novelis is further required "[p]rior to disclosure of Confidential Information to Novelis' Representatives, [to] enter into written agreements with such parties that contain restrictions on the disclosure of Confidential Information that are at least as restrictive as the terms and conditions of this Article 4, if the Representatives are not already bound by such a written agreement." License, §4.1.

**Arconic Shares Trade Secret and Confidential Information on A951 with Novelis**

43.     Under the NDA and License, Arconic shared confidential information with Novelis so that Novelis could use A951 with Ford.

44.     For a period of several years, Arconic employees such as Jim Marinelli and Sherri McCleary, key contributors to the A951 process for two decades, worked to educate Novelis employees, including alleged Novelis inventors Michael Bull and Theresa Elizabeth MacFarlane (formerly Theresa Warrender), so they understood elements of A951 and could replicate the results on Novelis' own line.

45.     On January 5, 2012, pursuant to the NDA, Arconic provided Novelis confidential information and materials.

46.     These materials stated that "[a]ll discussion during this meeting falls under the auspices of the [Arconic]/Novelis nondisclosure agreement.  While the dialogue will be as open as possible, in the absence of a licensing agreement answers to some questions may need to be deferred to a later date."

47.     All documents were labeled "[Arconic] Confidential Information."

48.     Arconic provided information on the A951 process on topics including cleaning/deoxidation steps, Arconic pilot lines, A951 elemental concentrations, prototype panels

as well as diagrams reflecting elements of the process.

49.     On September 13-14, 2012, Arconic and Novelis' technical teams met in Pittsburgh, Pennsylvania for an A951 Workshop during which Arconic continued to share confidential information pursuant to the parties' agreements.

50.     Novelis employees Theresa Elizabeth MacFarlane and Michael Bull and former Arconic employee Todd Summe attended for Novelis.

51.     The presentation included a statement that there was "a Confidentiality Agreement between the companies" which allowed the parties to share information on the "951 topic" but required documenting in meeting minutes.

52.     The presentation confirmed that no "new" ideas, improvements, or joint developments should be shared.

53.     The presentation also made clear that the parties must "recognize and respect the confidentiality of the shared info[rmation.]"

54.     The Confidential Meeting Minutes from this September 13-14, 2012 meeting reflect that they "contain[] proprietary information from both [Arconic] and Novelis."

55.     The Confidential Meeting Minutes list "ground rules for Confidentiality and Antitrust" as an agenda item.

56.     The Confidential Meeting Minutes also reflect diagrams of the Arconic 951 pretreatment at the MSC facility,[1] include comparisons of Arconic and Novelis' lines, and list details on the A951 bath.

57.     On January 18, 2013, Arconic and Novelis had a joint technical meeting in

---

[1] MSC is a third party facility where the A951 process occurs pursuant to a separate patent/trade secret license agreement that contains confidentiality provisions.

Atlanta, Georgia during which Arconic continued to share confidential information pursuant to the parties' agreements.

58.     Novelis' Theresa Elizabeth MacFarlane and Michael Bull and former Arconic employee Todd Summe attended for Novelis.

59.     The agenda included a Novelis/Arconic Technical Team Update, a discussion of deoxidation and other trials, and a review of the results of applying A951 treatment to Novelis coils.

60.     A January 25, 2013 email summarizing this meeting noted that Novelis requested disclosure of the components for A951 but the "current Technology Access and License Agreement does not allow for the disclosure."

61.     This January 25, 2013 email also noted that Arconic would send data to Novelis on rinse trial samples, historic data on trials run at MSC for purposes of conducting analysis, and information on how Arconic developed A951 and the reason for selecting certain components.

62.     On February 13-14, 2013, Novelis and Arconic had a Joint Technical Meeting in Farmington Hills, Michigan during which Arconic continued to share confidential information pursuant to the parties' agreements.

63.     On March 8, 2013, Arconic and Novelis provided an update to Ford in Dearborn, Michigan.

64.     The Arconic 951 Joint Technical Team Update presentation was labeled "Confidential and Proprietary Information …. Not to be released without permission."

65.     The presentation included a timeline of key events for the A951 process and an update from Novelis on their progress testing the A951 process, including temperatures and dwell times.

66.     Arconic's Jim Marinelli and Luis Vega presented on Process FMEA[2]/Operational Parameters and Environmental Health & Safety.

67.     On April 4, 2013, Novelis and Arconic had a joint technical meeting on A951 temperatures and joint process/FMEA.

68.     Novelis' Theresa Elizabeth MacFarlane and Michael Bull and former Arconic employee Todd Summe attended for Novelis.

69.     On May 2, 2013, Arconic and Novelis had an A951 team meeting in Novi, Michigan.

70.     The presentation materials included "confidential and proprietary information …"

71.     The presentation referenced issues with buildup in the A951 bath, rinse methods, trial data and results, and post rinse studies.

72.     On March 3, 2014, Arconic and Novelis had a joint meeting on "[Arconic] 951 Production" during which Arconic continued to share confidential information pursuant to the parties' agreements, including technical information on acceptable chemical range and operational line considerations.

73.     On June 23, 2014, Arconic and Novelis had an A951 Users Meeting.

74.     The parties discussed pilot line studies, re-rinse statistics, and pretreatment uniformity.

75.     Through these and many other exchanges, Novelis gained in-depth knowledge of Arconic's trade secrets and confidential information pertaining to its A951 process.

**Novelis Hires Key Arconic Employees With A951 Knowledge**

76.     Novelis went on a hiring spree of current and former Arconic employees, many of

---

[2] FMEA is an acronym for Failure Mode Effect Analysis.

whom had significant knowledge of A951.

77.     At Arconic, Todd Summe was Manager of the Automotive Design group.  While interviewing with Novelis but still at Arconic, Summe repeatedly attempted to schedule meetings with A951 inventors, Sherri McCleary and Jim Marinelli, and asked for information about the A951 process including copies of test results and related documents.  Ms. McCleary and Mr. Marinelli were suspicious of his "persistent" efforts.

78.     Novelis hired Todd Summe as Vice President of Global Research and Development.

79.     While at Novelis, Summe attempted to recruit Arconic employees to work there.

80.     Michael Bull and Theresa Elizabeth MacFarlane, alleged Novelis co-inventors, report to Summe.

81.     Summe attended A951 technical meetings along with Mr. Bull and Ms. MacFarlane on behalf of Novelis starting as early as September 2012.

82.     At Arconic, Luis Vega led the Engineered Surfaces group and had access to confidential and proprietary information about the A951 process.

83.     Novelis hired Luis Vega within six months of his departure from Arconic.

84.     Novelis has also sought and hired other Arconic employees with confidential and proprietary information about the A951 process.

### Novelis Used Arconic Trade Secrets and Confidential Information

85.     After obtaining Arconic trade secrets and confidential information, Novelis used and disclosed that information.

86.     Novelis Corp. shared Arconic trade secrets and confidential information with Novelis Inc.

87.     According to United States Patent & Trademark Office ("PTO") documents that were not public at the time, on May 1, 2015, Novelis filed a United States Provisional Patent Application Serial No. 62/155,731 ("Provisional Application No. 1").

88.     Provisional Application No. 1 is based on and contains information that is lifted from Arconic trade secrets and confidential information that had been shared by Arconic with Novelis pursuant to the NDA and the License.

89.     According to PTO documents that were not public at the time, on May 6, 2015, Novelis filed a United States Provisional Patent Application Serial No. 62/157,721 ("Provisional Application No. 2").

90.     Provisional Application No. 2 is also based on and contains information that is lifted from Arconic trade secrets and confidential information that had been shared by Arconic with Novelis pursuant to the NDA and the License.

91.     According to PTO documents that were not public at the time, on April 29, 2016, Novelis filed a non-provisional United States Patent Application Serial No. 15/142,384 (the "Non-Provisional Application"), which claimed priority to Provisional Application No. 1 and Provisional Application No. 2.

92.     The Non-Provisional Application is also based on and contains information that is lifted from Arconic trade secrets and confidential information that had been shared by Arconic with Novelis pursuant to the NDA and the License.

93.     According to PTO documents that were not public at the time, also on April 29, 2016, Novelis filed an international PCT Patent Application No. 2016/0300000 (the "PCT Application"), which also claimed priority to Provisional Application No. 1 and Provisional Application No. 2.

94.     The PCT Application is also based on and contains information that is lifted from Arconic trade secrets and confidential information that had been shared by Arconic with Novelis pursuant to the NDA and the License.

95.     Novelis kept these filings secret from Arconic.

96.     Both the Non-Provisional Application and the PCT Application falsely list Novelis' Michael Bull and Theresa Elizabeth MacFarlane as co-inventors.

97.     Arconic is the true inventor of this technology.

98.     Indeed, Arconic's employees/inventors literally taught Mr. Bull and Ms. MacFarlane this technology.

99.     Months later, the Non-Provisional Application and the PCT Application, including the Arconic trade secrets and confidential information recited therein, were published (as U.S. Patent Application Publication No. 2016/0319440 and International Patent Application Publication No. WO2016/0178963, respectively) for all the world to see.

100.    By prompting publication of Arconic trade secrets and confidential information, Novelis seeks to destroy their value and status and to obtain an unfair competitive advantage.

101.    Use of Arconic's trade secrets and confidential information would cause harm to Arconic, as well as to Arconic's existing and future business relationships, that cannot be quantified.

**Novelis Asserts Entitlement To Use Arconic Ion Exchange Patents**

102.    Arconic is also the developer of certain "Ion Exchange" technology that makes the A951 process more efficient.

103.    Arconic is the owner of U.S. Patent No. 6,020,030, which covers Ion Exchange technology.

104.    The License expressly states what was licensed and does not include U.S. Patent No. 6,020,030.

105.    Contrary to the plain language of the License, Novelis asserted that Novelis has the right under the License to practice U.S. Patent No. 6,020,030 and Ion Exchange technology.

## CAUSES OF ACTION

### COUNT I – BREACH OF LICENSE AGREEMENT
### (Against Novelis Inc.)

106.    Arconic re-alleges and incorporates by reference the preceding paragraphs as if set forth herein.

107.    Arconic and Novelis Inc. signed the License to protect Arconic's confidential information (including trade secrets) and to return all such information to Arconic upon termination of the contract.

108.    Novelis Inc. has materially breached this agreement with Arconic by, among other things, misappropriating and misusing Arconic's confidential proprietary information and trade secrets.

109.    As a direct result of Novelis Inc.'s breaches of its contractual obligations, Arconic has been injured.

110.    Arconic is entitled to full compensatory, consequential, and punitive damages.

### COUNT II – BREACH OF NON-DISCLOSURE AGREEMENT
### (Against Novelis Corp.)

111.    Arconic re-alleges and incorporates by reference the preceding paragraphs as if set forth herein.

112.    Arconic and Novelis Corp. signed the NDA to protect Arconic's confidential information (including trade secrets) and to return all such information to Arconic upon termination of the contract.

113.     Novelis Corp. has materially breached this agreement with Arconic by, among other things, misappropriating and misusing Arconic's confidential proprietary information and trade secrets.

114.     As a direct result of Novelis Corp.'s breaches of its contractual obligations, Arconic has been injured.

115.     Arconic is entitled to full compensatory, consequential, and punitive damages.

## COUNT III – MISAPPROPRIATION OF TRADE SECRETS (18 U.S.C. § 1831, et seq.) (Against All Defendants)

116.     Arconic re-alleges and incorporates by reference the preceding paragraphs as if set forth herein.

117.     Arconic operates its business and sells its services in interstate and foreign commerce, transacting and doing business with customers, vendors and others throughout the United States and internationally.

118.     Arconic conceives, designs, and develops trade secrets, as that term is defined under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1839(3).

119.     Among other information, Arconic's trade secrets encompass its A951 process.

120.     Arconic obtains economic value from its trade secrets through devoting substantial resources, time and investment to creating, developing, and using such information. Arconic also obtains actual and potential economic value from its trade secrets not being generally known or readily ascertainable through proper means by another person or entity who could obtain economic value from the disclosure or use of the information.

121.     Arconic has taken reasonable steps and precautions to safeguard its trade secrets and to limit and restrict others outside of Arconic from knowing, readily ascertaining or using its trade secrets, including limiting access to sensitive information, requiring strict email protection

for its email system, requiring Novelis to sign agreements prohibiting use and disclosure of such information outside of Arconic, protecting files through physical security at storage sites and facilities which restrict access without a company badge or identification, and requiring the return of sensitive materials upon termination of the agreements.

122.   Novelis has disclosed and used Arconic's trade secrets without express or implied consent despite acquiring this information under circumstances giving rise to a duty to maintain the secrecy of those trade secrets.

123.   By engaging and continuing to engage in the conduct and activities described herein including but not limited to its ongoing prosecution of the Non-Provisional Application and the PCT Application, Novelis has used and/or disclosed, threatens to use and/or disclose, or will inevitably use and/or disclose trade secrets of Arconic.

124.   Novelis' actual and threatened misappropriation of those trade secrets has caused Arconic to suffer harm, including but not limited to the potential loss of customers, reputation and customer goodwill, and the actual loss of its investment in its trade secrets.

125.   As a result of Novelis' improper misappropriation, disclosure, and use of Arconic's trade secrets, Novelis has violated the DTSA.

126.   Arconic is entitled to full compensatory and consequential damages, as well as full attorneys' fees, costs and expenses, jointly and severally from Novelis.

127.   Because Novelis' DTSA violations have been willful and malicious, Arconic is entitled to exemplary damages of more than twice the amount of damages for any actual loss and any unjust enrichment.

## COUNT IV – MISAPPROPRIATION OF TRADE SECRETS (PENNSYLVANIA LAW)
### (Against All Defendants)

128.   Arconic re-alleges and incorporates by reference the preceding paragraphs as if

18

set forth herein.

129.    Arconic conceives, designs, and develops trade secrets, as that term is defined under the Pennsylvania Uniform Trade Secrets Act, 12 Pa C.S. § 5301, et seq. ("PUTSA").

130.    Among other information, Arconic's trade secrets encompass its A951 process.

131.    Arconic obtains economic value from its trade secrets through devoting substantial resources, time, and investment to creating, developing, and using such information. Arconic also obtains actual and potential economic value from its trade secrets not being generally known or readily ascertainable through proper means by another person or entity who could obtain economic value from the disclosure or use of the information.

132.    Arconic has taken reasonable steps and precautions to safeguard its trade secrets and to limit and restrict others outside of Arconic from knowing, readily ascertaining or using its trade secrets, including limiting access to sensitive information, requiring strict email protection for its email system, requiring Novelis to sign agreements prohibiting use and disclosure of such information outside of Arconic, protecting files through physical security at storage sites and facilities which restrict access without a company badge or identification, and requiring the return of sensitive materials upon termination of the agreements.

133.    Novelis has disclosed and used Arconic's trade secrets without express or implied consent despite acquiring this information under circumstances giving rise to a duty to maintain the secrecy of those trade secrets.

134.    By engaging and continuing to engage in the conduct and activities described herein (including through its ongoing prosecution of the Non-Provisional Application and the PCT Application), Novelis has used and/or disclosed, threatens to use and/or disclose, or will inevitably use and/or disclose trade secrets of Arconic.

135.     Novelis' actual and threatened misappropriation of those trade secrets has caused Arconic to suffer harm, including but not limited to the potential loss of customers, reputation and customer goodwill, and its actual loss of its investment in its trade secrets.

136.     As a result of Novelis' improper misappropriation, disclosure, and use of Arconic's trade secrets, Novelis has violated the PUTSA.

137.     Arconic is entitled to full compensatory and consequential damages, as well as full attorneys' fees, costs and expenses, jointly and severally from Novelis.

138.     Because Novelis' PUTSA violations have been willful and malicious, Arconic is entitled to exemplary damages of more than twice the amount of damages for any actual loss and any unjust enrichment.

### COUNT V – UNFAIR COMPETITION
### (Against All Defendants)

139.     Arconic re-alleges and incorporates by reference the preceding paragraphs as if set forth herein.

140.     Novelis is engaging in unlawful intentional business practices by misappropriating Arconic confidential information, and by using Arconic confidential and trade secret information to undermine Arconic's business to help the business of Novelis.

141.     Novelis' unlawful conduct has led to a diminution in value of Arconic's trade secrets and other damages.  Arconic is entitled to full compensatory, consequential, and punitive damages, in an amount to be established at trial.

### COUNT VI – CONVERSION
### (Against All Defendants)

142.     Arconic re-alleges and incorporates by reference the preceding paragraphs as if set forth herein.

143.     Arconic provided Novelis with confidential information including but not limited

to Arconic Technology and Know-How.

144.    Arconic had a property interest in its confidential information, which Novelis has wrongly and willfully used and continues to use.

145.    Novelis willfully and without lawful justification filed Provisional Application No. 1, Provisional Application No. 2, Non-Provisional Application, and PCT Application which appropriated Arconic's property without its consent.

146.    Novelis hired former Arconic employees, including but not limited to Luis Vega and Todd Summe, who had knowledge of the A951 process and could not perform their job functions without using Arconic's proprietary information.

147.    Novelis has misused and is misusing Arconic's confidential information, which unfairly competes with Arconic and interferes with Arconic's prospective contractual relationships, in defiance of Arconic's rights.

148.    As a result of Novelis' conduct, Arconic has been injured.

149.    Arconic is entitled to full compensatory, consequential, and punitive damages, in an amount to be established at trial.

### COUNT VII – DECLARATORY JUDGMENT
### (Against Novelis Inc.)

150.    Arconic re-alleges and incorporates by reference the preceding paragraphs as if set forth herein.

151.    Pursuant to the Declaratory Judgments Act, 42 Pa. C.S. §§ 7531-41, this Court has the power to declare rights, status and other legal relations, and such declarations shall have the force and effect of a final judgment or decree.  42 Pa. C.S. § 7532.

152.    An actual and justiciable controversy exists between these parties regarding Novelis' entitlements under the License.

153.    The License lists the Arconic (then Alcoa) patents that were subject to the license grant therein.

154.    The License does not list, or refer to, Arconic's U.S. Patent No. 6,020,030 (the "Ion Exchange Patent"), which covers the process to help keep the A951 bath clean.

155.    This Court can resolve the controversy by issuing a declaration of the parties' rights, status and legal relations under the License.

156.    Arconic is entitled to and seeks a declaratory judgment that the License does not include the Ion Exchange Patent.

## COUNT VIII – INJUNCTIVE RELIEF
### (Against All Defendants)

157.    Arconic re-alleges and incorporates by reference the preceding paragraphs as if set forth herein.

158.    Arconic will suffer substantial and irreparable harm if Novelis is permitted to continue using Arconic's trade secrets and confidential information.

159.    Arconic will suffer substantial and irreparable harm if Novelis is permitted to use Arconic's trade secrets and confidential information to seek to obtain foreign patents.

160.    Arconic has a clear right to relief on the merits, including a clear right to injunctive relief.

161.    Arconic is without an adequate remedy of law.

162.    The granting of injunctive relief is necessary to prevent Novelis from continuing to interfere with Arconic and prevent Novelis from unfairly competing with Arconic in the Commonwealth of Pennsylvania.

163.    The issuance of an injunction will restore the parties to the status quo.

164.    The harm alleged by Arconic is manifest, and the injunctive relief requested is

narrowly suited to abate this harm.

165.    Greater harm will be inflicted on Arconic and the general public by the denial of the requested injunctive relief than the harm, if any, that will be suffered by Novelis if the injunctive relief is granted.

166.    Accordingly, Arconic is entitled to injunctive relief which enjoins Novelis from using Arconic's trade secrets and confidential information and otherwise engaging in unfair competition.

## **PRAYER FOR RELIEF**

Wherefore, Arconic is entitled to judgment in its favor and against Novelis Inc. and Novelis Corp. and is entitled to the following relief:

A. An award of compensatory, consequential, exemplary, and punitive damages to Arconic in an amount to be determined at trial;

B. An Order enjoining Novelis from using Arconic's trade secrets and confidential information;

C. An Order directing Novelis to abandon the Non-Provisional Application and any and all other United States patent applications that claim priority thereto and/or that contain Arconic's trade secrets;

D. With respect to any and all foreign applications that claim priority to the PCT Application or any other foreign applications that contain Arconic's trade secrets, an Order that Novelis, based on each applicable country's law, either:  (i) abandon any and all such foreign applications; or (ii)(a) assign any and all such foreign patent applications to Arconic; (b) remove the Novelis employees as inventors on any and all such foreign applications; and (c) add appropriate Arconic employees

(or former employees) as inventors on any and all such foreign applications;

E.  A declaratory judgment that the Ion Exchange Patent is not covered by License;

F.  An award of attorneys' fees and costs incurred to bring this suit;

G.  An award of pre-judgment and post-judgment interest as allowed by law; and

H.  Such other relief as may be warranted.

## DEMAND FOR JURY TRIAL

Arconic hereby requests a jury trial on all claims.

Respectfully submitted,

s/ Patricia L. Dodge
Patricia L. Dodge
Antoinette C. Oliver
MEYER, UNKOVIC & SCOTT LLP
535 Smithfield Street, Suite 1300
Pittsburgh, PA 15222-2315
Telephone: (412) 456-2800
Fax: (412) 456-2864

Mark A. Klapow (*pro hac* vice pending)
Michael J. Songer (*pro hac* vice pending)
Julia R. Milewski (*pro hac vice* pending)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2975
Fax: (202) 628-5116

*Attorneys for Plaintiff Arconic Inc.*