# Exhibit 2

# Technology Access & License Agreement

This Technology Access and License Agreement (the "**Agreement**") is made effective as of August 15, 2012 (the "**Effective Date**"), by and between Alcoa Inc., a Pennsylvania corporation through its Alcoa Technical Center, with offices located at 100 Technical Center Drive, Alcoa Center, Pennsylvania 15069, and its Global Aerospace, Transportation, Industrial and Specialty Products business unit, with offices located at 5600 North River Road, Suite 620, Rosemont, Illinois 60018 USA (collectively, "**Alcoa**"), and Novelis Inc., a Canadian corporation with offices at 3560 Lenox Road, Atlanta, Georgia 30326 USA ("**Novelis**"). Alcoa and Novelis being individually or collectively hereinafter referred to as "**Party**" or "**Parties**."

## RECITALS

**WHEREAS**, Alcoa is the owner of the entire right, title and interest in and to the Alcoa Technology and Know-How for the Alcoa 951 Pretreatment Process; and

**WHEREAS**, Novelis desires to obtain from Alcoa access to and a license to use the Alcoa Technology and Know-How in support of Novelis' participation in the Ford Motor Company P552 Program and Alcoa is willing to grant such access and rights to Novelis.

**NOW THEREFORE**, in consideration of the mutual covenants and promises contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows:

**Article 1.**     **Definitions.** As used in this Agreement, the following terms, whether used in the singular or plural, shall have the following meanings:

1.1     "**Alcoa 951 Pretreatment Process**" means an organic acid-based pretreatment system applied to aluminum substrates via (a) spray, immersion, or roll application methods and (b) the Alcoa Technology and Know-How (defined below) for the chemical composition, coating processes, coating-testing procedures, and assembly of aluminum sheet components in an aluminum intensive vehicle.

1.2     "**951 Chemicals**" means the Alcoa proprietary chemical composition utilized in the Alcoa 951 Pretreatment Process as set forth in the Alcoa Patents and augmented by Alcoa Technology and Know-How.

1.3     "**Alcoa Patents**" means United States Patent Nos. 5,463,804 and 6,167,609B1 together with all divisions, reissues, continuations, continuations in part in all corresponding foreign applications and patents that claim any of the inventions first disclosed in the above described patents and patent applications.

1.4     "**Alcoa Technology and Know-How**" means the Alcoa Patents and all proprietary trade secrets, scientific, technical and commercial data, drawings, designs, operating experience and techniques, testing results, regulatory submissions, methods of manufacture, specifications, processes, procedures, inventions and other information of any kind of Alcoa, now existing or developed by Alcoa during the term of this Agreement, whether patentable or

not, as outlined in Attachment A and the details of such Alcoa Technology and Know-How that will be made accessible to, disclosed and delivered to Novelis for the implementation of the Alcoa 951 Pretreatment Process during the term of this Agreement.

1.5  "**Audit Period**" has the meaning set forth in Section 3.2.

1.6  "**Confidential Information**" means materials, trade secrets, or other intellectual property and information, including, without limitation, proprietary information and materials (whether or not patentable), as may be disclosed at any time by either Party to the other Party under this Agreement, including, without limitation, all information constituting Alcoa Technology and Know-How and Novelis' disclosures made to Alcoa during the activities contemplated under the terms and conditions of this Agreement.

1.7  "**Consulting Services**" has the meaning set forth in Section 3.4.1.

1.8  "**Ford Motor Company P552 Program**" means the design and manufacture of a specific aluminum intensive vehicle currently identified by Ford Motor Company as the 'P552 Program', including the serial production and service part requirements for said P552 Program.

1.9  "**Improvements**" means any changes, additions, expansions, revisions, enhancements, inventions, or developments that are made to the Alcoa Technology and Know-How.

1.10  "**Joint Development**" means any invention, development, work of authorship, or other intellectual property jointly developed by the Parties that is not based on the Alcoa Technology and Know-How.

1.11  "**Novelis Production Facility**" shall mean its Oswego, NY—Production site.

1.12  "**Novelis Trial and Testing/Non-Production Facilities**" shall mean its: (1) Kingston, Ontario facility (Lab Only), (2) Sierre, Switzerland facility (Non-Commercial Site), (3) Walbridge, OH (MSC-Trials and Development), and (4) other Non-Commercial sites as may be mutually agreed to by the Parties.

1.13  "**Representatives**" has the meaning set forth in Section 4.1.

1.14  "**Total Volume**" means the total amount, in pounds, of coils utilizing the Alcoa 951 Pretreatment Process produced by Novelis and sold for the Ford Motor Company P552 Program.

**Article 2.**  **Grant of Access and Rights.**

2.1  **Technology Access and License Grant.** Subject to the terms and conditions of this Agreement, Alcoa hereby agrees to provide access to its Alcoa 951 Pretreatment Process and the Alcoa Technology and Know-How and grants to Novelis and Novelis hereby accepts a non-exclusive, non-transferable license, without the right to grant sublicenses, under the Alcoa 951 Pretreatment Process and Alcoa Technology and Know-How, (i) to make and use in Novelis Production Facility, and offer for sale and sell, the coils utilizing the Alcoa 951 Pretreatment

2

Process during the term of this Agreement and, (ii) to make and use coils utilizing the Alcoa 951 Pretreatment Process in Novelis Trial and Testing/Non-Production Facilities. For purposes of this Agreement, Improvements made by Alcoa to Alcoa Technology and Know-How may be disclosed to Novelis at the sole reasonable discretion of Alcoa, provided however, Alcoa agrees not to withhold an Improvement when doing so would impede Novelis production.

2.2 **Retained Rights.**

2.2.1 Subject to the license provided in Section 2.1, Alcoa retains all right, title and interest in and to the Alcoa 951 Pretreatment Process and the Alcoa Technology and Know-How, and Novelis, except as provided in Section 2.1, does not obtain any additional license or other right, express or implied, to such Alcoa Technology and Know-How. Notwithstanding the foregoing, Novelis shall not be prohibited from using any elements of the methods, procedures, processes, or compositions that may be included in the Alcoa 951 Pretreatment Process to the extent that any such elements are general industry knowledge or are anticipated and disclosed by Novelis technical and commercial data, drawings, designs, operating experience and techniques, processes and procedures. Any such element must be demonstrated, in writing, to have been in Novelis' possession prior to its receipt from Alcoa; or, is now or hereafter becomes available to the public without breach of the obligations under this Agreement by Novelis. Notwithstanding the above, for operating experience and techniques, these elements must be demonstrated, by affidavit, to have been in Novelis' possession prior to its receipt from Alcoa; or, is now or hereafter becomes available to the public without breach of the obligations under this Agreement by Novelis. Any affidavit relied upon may be subject to challenge by Alcoa and will not, in and of itself, be considered dispositive. These exceptions shall not be interpreted as grounds for disregarding the obligations under this Agreement merely because the element in question is implied by, but not specifically disclosed in, general industry knowledge, and Novelis shall have the burden of proving the applicability of any exception

2.2.2 Subject to the terms of this Agreement, Novelis retains all right, title and interest in and to its own technology and know-how, including but not limited to, all proprietary trade secrets, scientific, technical and commercial data, drawings, designs, operating experience and techniques, testing results, regulatory submissions, methods of manufacture, specifications, processes, procedures, inventions and other information of any kind of Novelis, now existing or developed by Novelis during the term of this Agreement, whether patentable or not, and Alcoa does not obtain any license or other right, express or implied, thereto to the extent that said technology and know-how is subject to the obligations of confidentiality as provided in this Agreement.

2.2.3 **Ownership of Improvements and Joint Developments.** Each Party shall retain its ownership rights with respect to Improvements it develops independently of the other Party. Any Improvements developed jointly by the Parties shall be documented by the Parties and shall be jointly owned by the Parties. However, the Parties agree that jointly developed Improvements and Joint Developments will be restricted to use by the Parties and the disclosure of such jointly developed Improvements or Joint Developments by either Party to third-parties is subject to the mutual consent of the Parties. Upon termination of this Agreement and the license granted herein, the Parties' future rights and obligations relating to such jointly developed Improvements and Joint Developments shall be governed by the surviving obligations

3

of this Agreement and applicable patent and copyright laws; provided, however, that neither Party shall have an accounting obligation to the other Party.

**Article 3. Fees; Books of Account, Reports and Technical Support and Alcoa 951 Commercialization.**

    3.1    **Fees, Method of Payment.**

        **3.1.1**  Novelis shall pay to Alcoa, (i) within thirty days of the Effective Date an initial lump sum payment of $100,000 USD and, (ii) during the term of this Agreement an annual lump sum payment of $50,000 USD on the anniversary of the Effective Date in consideration of the license granted in Section 2.1(i), and (iii) within thirty days of the Effective Date an initial lump sum payment of $50,000 USD in consideration of the license granted in Section 2.1(ii).

        **3.1.2**  Novelis shall pay to Alcoa a Technology Access Fee of $0.015 per pound of the Total Volume (the "**Technology Access Fee**"). The Technology Access Fee shall be payable at the time Novelis provides its quarterly reports to Alcoa in accordance with the terms of Section 3.3 herein.

        **3.1.3**  Payment by Novelis of any royalties hereunder does not constitute acceptance of the amount payable to Alcoa under any such payment. All payments hereunder shall be payable in immediately available funds to an account designated by Alcoa via Electronic Funds Transfer (EFT) or such other electronic payment form as agreed to in writing by Alcoa by the 15th of each month following the close of the prior quarter.

        **3.1.4**  Notwithstanding anything to the contrary contained in this Article 3, if Novelis is more than sixty (60) days in arrears in any payment due under this Article 3, Alcoa may terminate this Agreement pursuant to Section 8.2 hereof. Delayed payment or non-payment by any of Novelis' customers shall not affect Novelis' obligations to pay royalties to Alcoa in accordance with the provisions of this Article 3. Neither Party shall have the right to set off any amounts due to such Party under this Agreement against any amount payable by such Party under any other agreement between the Parties.

        **3.1.5**  Novelis shall collect, report and pay to the relevant taxing authority, and indemnify Alcoa for any liability relating to all applicable excise, property, sales and use or similar taxes, in addition to or in lieu thereof. All royalty payments are payable in full to Alcoa without deduction and without withholding for any tax whatsoever. Alcoa is responsible for paying taxes on any income it receives from Novelis in the form of fees or royalties under this Agreement.

        **3.1.6**  If Alcoa incurs any costs, expenses, or fees, including reasonable attorneys' fees and professional collection services fees, in connection with the collection of any royalties sixty (60) days overdue under this Agreement, Novelis agrees to reimburse Alcoa for all such costs, expenses and fees.

    3.2    **Books of Account.** Novelis shall at all times keep separate, adequate and accurate books of account and records directly related to the license hereby granted in accordance with good accounting practice showing the Total Volume upon which the

Technology Access Fee is calculated. During each calendar year of this Agreement and for two (2) years after expiration or other termination of this Agreement (the "**Audit Period**"), Alcoa has the right to appoint a nationally recognized independent public accounting firm reasonably agreeable to Novelis (the "**Accounting Firm**") during Novelis' normal business hours, and upon reasonable notice to Novelis, to inspect and audit said books of account and records and all other documents, materials and inventory in the possession or under the control of Novelis solely with respect to books and records directly related to the calculation of the Technology Access Fee (the "**Audit Materials**"). The Accounting Firm shall have access to the Audit Materials for the previous twenty-four (24) months for said purposes, and Novelis shall maintain the Audit Materials throughout the Audit Period; provided, however, Novelis may redact information from the Audit Materials not directly related to the coils utilizing the Alcoa 951 Pretreatment Process. Alcoa acknowledges and agrees that is shall not have any access to the Audit Materials during the Audit Period or at any other time during the term of this Agreement. Prior to the commencement of any audit, the Accounting Firm shall acknowledge in writing the restriction in the previous sentence. The Accounting Firm shall provide a report regarding the audit to Alcoa, but the report shall not include any Audit Materials. Such inspection and audit by the Accounting Firm may be made not more often than once every calendar year and at Alcoa's own expense; provided, however, that to the extent such audit reveals that Novelis underpaid the amount of royalties due to Alcoa by five percent (5%) or more in any one (1) quarterly reporting period, all reasonable expenses (including reasonable attorney's fees and collection costs) in connection with such audit shall be borne by Novelis. If any inconsistencies or mistakes are discovered in any royalty statements, the same shall be immediately rectified and the appropriate payments made by Novelis or, in the case of overpayments that are to be refunded to Novelis, by Alcoa, together with interest thereon at the prime rate announced by the principal bank of Alcoa as its prime commercial lending rate from time to time.

3.3    **Reports**.

3.3.1    Throughout the term of this Agreement, Novelis shall make quarterly reports to Alcoa on or before the last day of April, July, October, and January, showing the Total Volume for the preceding calendar quarter, and the royalty payable to Alcoa pursuant to Section 3.1. Such reports shall set forth reasonably detailed information showing the coils utilizing the Alcoa 951 Pretreatment Process produced by Novelis and sold in support of the Ford Motor Company P552 Program and a calculation of the applicable royalties, all for the previous quarterly period. The fees payable by Novelis to Alcoa will accompany such quarterly reports. Receipt or acceptance by Alcoa of any statements furnished pursuant to this Agreement or of any sums paid hereunder shall not preclude Alcoa from questioning the correctness thereof at any time.

3.3.2    Novelis will make yearly reports on a calendar basis to Alcoa on or before the last day of January of each contract year stating the Total Volume or all coils utilizing the 951 Pretreatment Process Produced and sold in support of the Ford Motor Company P552 Program.

3.4    **Technical Support**.

**3.4.1** Alcoa agrees to provide to Novelis, at Novelis' request, technical support and advice ("**Consulting Services**") for the implementation of Alcoa Technology and Know-How at Novelis Production Facility subject to the following provisions: (i) Novelis shall reimburse Alcoa for reasonable travel expenses associated with the Consulting Services, and (ii) Alcoa shall provide up to a total of 60 person days (consisting of 8 hours per day) of such Consulting Services during the first year of the Agreement, and (iii) up to a total of 30 person days each year for the remaining term of the Agreement.

**3.4.2** Alcoa agrees to provide to Novelis, at Novelis' request, Consulting Services for the implementation of Alcoa Technology and Know-How at Novelis Trial and Testing/Non-Production Facilities subject to the following provisions: (i) Novelis shall reimburse Alcoa for reasonable travel expenses associated with the Consulting Services, and (ii) Alcoa shall provide up to a total of 30 person days (consisting of 8 hours per day) of such Consulting Services during the first year of the Agreement.

**3.4.3** Alcoa may agree to provide additional technical support to Novelis in addition to the Consulting Services provided under Section 3.4.1, at Novelis' request and in Alcoa's sole discretion, subject to Alcoa's terms and conditions for the provision of consulting services as mutually agreed to by the Parties.

**3.4.4** Subject to Paragraph 3.5, Alcoa agrees to supply the 951 Chemicals to Novelis in a form and manner sufficient for high volume production by Novelis, subject to Alcoa's terms and conditions of sale as mutually agreed by the Parties. In the event of a conflict between the terms and conditions of this Agreement and any Alcoa terms and conditions, the terms of this Agreement shall govern and control. Alcoa agrees to provide 951 Chemicals, such steps to include, mixing chemicals internally or establishing a third-party chemical compounder to provide the 951 Chemicals to Novelis on behalf of Alcoa, consistent with the requirements of this agreement. In the event that Alcoa cannot provide the 951 Chemicals to Novelis as required in this Agreement, then Alcoa will promptly notify Novelis in writing of its inability to supply 951 Chemicals. Novelis may take action to satisfy its supply obligations to Ford, including (i) manufacturing the 951 Chemicals, or (ii) having the 951 Chemicals manufactured by a third party. Alcoa will use commercially reasonable efforts to ensure that Novelis can satisfy its production requirements and supply obligations to Ford, including without limitation, a waiver of the restrictions in Section 4.4. The remedy provided in this Section 3.4.4 shall only be available to Novelis for so long as Alcoa's failure to supply the 951 Chemicals continues. It is estimated that the 2012 per gallon price of 951 Chemicals supplied by Alcoa will be less than $5.00, (the "Price") which equates to a chemical treatment pricing (independent of any fees) of about $0.002 / pound of metal. If there is a material difference between the actual application rates or costs of the 951 Chemicals and the rates or costs estimated herein for purchases from Alcoa, the Parties agree to meet and negotiate in good faith regarding an adjustment of the Price.

3.5  **Alcoa 951 Commercialization.**

**3.5.1** Alcoa is exploring the broad-based commercialization of its Technology and Know-How through a licensed third-party chemical supplier. In the event of such commercialization, Alcoa agrees to notify Novelis as per Paragraph 9.4 and the Parties agree that the following terms and conditions of this Agreement will be suspended: Article 3.1.1 (ii) ( the

6

annual lump sum of $50,000), Article 3.1.2 (Technology Access Fee); and Article 3.4 (Technical Support); however, Alcoa may agree to provide additional technical support to Novelis at Novelis' request and in Alcoa's sole reasonable discretion, subject to Alcoa's standard terms and conditions for the provision of consulting services. The Parties acknowledge that upon said third-party commercialization of the Alcoa Technology and Know-How, market forces will dictate the price charged by said third-party for access to the 951 Chemicals and Alcoa Technology and Know-How. Alcoa will make commercially reasonable efforts to ensure that Novelis is not disadvantaged relative to any other competitor in any agreement between Alcoa and such third-party commercializing the Alcoa Technology and Know-How.

**Article 4. Confidentiality, Non-Analysis & Non-Solicitation**

4.1 Each Party shall maintain the Confidential Information disclosed to it by the other Party in confidence, and shall not disclose, divulge or otherwise communicate such Confidential Information to others, or use it for any purpose, except to fulfill its obligations hereunder, and hereby agrees to exercise every reasonable precaution to prevent and restrain the unauthorized disclosure of Confidential Information by any of its directors, officers, employees, consultants, subcontractors, or agents ("**Representatives**"). Prior to disclosure of Confidential Information to Novelis' Representatives, Novelis will enter into written agreements with such parties that contain restrictions on the disclosure of Confidential Information that are at least as restrictive as the terms and conditions of this Article 4, if the Representatives are not already bound by such a written agreement. Each Party will be responsible for any breach of this Agreement by its Representatives. Each Party also agrees to maintain the Confidential Information and the terms and conditions of this Agreement in confidence in accordance with this Section 4.1 for so long as this Agreement remains in full force and effect.

4.2 The provisions of Section 4.1 shall not apply to any Confidential Information disclosed hereunder or during the terms of this Agreement which: (i) can be demonstrated to have been in the receiving party's possession at the time of receipt of same; (ii) now or hereafter becomes available to the public without breach of this Agreement by the receiving Party; (iii) becomes available to the receiving Party from a third party having the legal right to disclose such information to the receiving Party; (iv) the receiving Party is legally required to disclose by a competent tribunal, provided that such Party has given timely notice to the disclosing Party of such legal obligation, enabling the disclosing Party to seek a protective order or other appropriate remedy, or waive compliance with appropriate provisions of this Article 4; or (v) are necessary to disclose to Ford or required by Ford to disclose relating to the obligations by either Party under the Ford Motor Company P552 Program; provided, however, Novelis shall notify Alcoa of the necessary or required information and Alcoa will not unreasonably deny Novelis' disclosure to Ford of such information. Notwithstanding the foregoing, Novelis shall not be prohibited from using any elements of the methods, procedures, processes, or compositions that may be in included in the Alcoa 951 Pretreatment Process to the extent that any such elements are general industry knowledge or are fully anticipated and disclosed in Novelis' internal technical and commercial data, drawings, designs, or are demonstrated and documented operating experience and techniques, processes and procedures. Any such element must be demonstrated, in writing, to have been in Novelis' possession prior to its receipt from Alcoa; or, is now or hereafter becomes available to the public without breach of the obligations under this Agreement by Novelis. Notwithstanding the above, for operating experience and techniques, these elements

7

must be demonstrated, by affidavit, to have been in Novelis' possession prior to its receipt from Alcoa; or, is now or hereafter becomes available to the public without breach of the obligations under this Agreement by Novelis. Any affidavit relied upon may be subject to challenge by Alcoa and will not, in and of itself, be considered dispositive. These exceptions shall not be interpreted as grounds for disregarding the obligations of confidentiality herein merely because the Confidential Information in question is implied by, but not specifically disclosed in, information falling within the pertinent exception, and Novelis shall have the burden of proving the applicability of any exception.

4.3  All obligations of confidentiality and nondisclosure with respect to Confidential Information shall survive any termination of this Agreement. Upon any expiration or termination of this Agreement, each Party shall promptly return to the other Party all documents and other tangible media containing Confidential Information, and all copies thereof.

4.4  Novelis shall not analyze the 951 Chemicals for chemical composition or cause the 951 Chemicals to be analyzed for chemical composition for purposes of reverse engineering for commercial production. Notwithstanding the foregoing, nothing in this Agreement shall prohibit Novelis from analyzing the 951 Chemicals for production of coils utilizing the Alcoa 951 Pretreatment Process produced by Novelis and sold in support of the Ford Motor Company P552 Program, including for production support, quality control, production efficiency, stability of Novelis' processes, or contamination of Novelis' systems.

4.5  During the duration of the Ford Motor Company P552 Program and for one year thereafter, Novelis will not, nor will it permit its affiliates, agents or contractors to directly, or indirectly, initiate any contact for the purpose of employment or hire by or on behalf of Novelis any officer or employee of Alcoa or any of its affiliates with technical, operational or developmental expertise regarding the 951 Chemicals or the Alcoa Technology and Know-How; provided, however, that this clause shall not preclude Novelis from hiring any such officer or employee who responds to any general solicitation placed by Novelis not specifically directed towards employees of Alcoa or its affiliates.

**Article 5.  Acknowledgement and Obligations.**

5.1  Novelis acknowledges and agrees not to challenge the validity, status, and ownership by Alcoa of the Alcoa Technology and Know-How.

**Article 6.  Representations and Warranties, Limitations of Liability and Disclaimers.**

6.1  Each Party hereto represents and warrants to the other that: (i) it has the full right and power to enter into and fully perform this Agreement in accordance with its terms; (ii) this Agreement constitutes a legal, valid and binding agreement of such Party, enforceable against such Party in accordance with its terms; (iii) it will comply with all applicable laws and regulations in the exercise and performance of its rights and obligations under this Agreement; and (iv) its execution, delivery and performance of this Agreement throughout its duration does not require consent from any third party and will not violate (with the lapse of time or giving of notice or both) rights granted by such Party to any third party or violate or otherwise interfere with the provisions of any agreement to which such Party is a party or otherwise bound, preclude

such Party from complying with the provisions hereof, or violate any applicable law or regulation or judicial order. Alcoa represents and warrants that the 951 Chemicals and the Alcoa Technology and Know-How have been shown to and will conform to the performance specifications for participation in the Ford Motor Company P552 Program at full production volumes as will be demonstrated on the Alcoa Davenport Works Automotive Treatment Line; provided, however, that this representation and warranty shall not apply to the extent any such non-conformance relates directly to the Novelis aluminum coil alloy or deviations/excursions in Novelis production processes unrelated to the 951 Chemicals and the Alcoa Technology and Know-How. Alcoa shall use good faith efforts to ensure that Novelis' use of the 951 Chemicals and the Alcoa Technology and Know-How, when applied to Novelis' aluminum coil alloy, will conform to the performance specifications for participation in the Ford Motor Company P552 Program. If Novelis' aluminum coil alloy does not conform to the performance specifications for participation in the Ford Motor Company P552 Program, the Parties agree to meet in good faith to discuss adjustments to the annual lump sum licensing fees as described in Section 3.1.1. Alcoa agrees to exercise good faith in supporting Novelis' utilization of Alcoa Technology and Know-How for Novelis' successful participation in the Ford Motor Company P552 Program.

  6.2 Except as specifically set forth in Section 6.1 above, Alcoa, by this Agreement, makes no warranties or guarantees, either express or implied, arising by law or otherwise with regard the Alcoa Technology and Know-How. EXCEPT AS SPECIFICALLY SET FORTH IN SECTION 6.1 ABOVE, THE ALCOA TECHNOLOGY AND KNOW-HOW IS PROVIDED "AS IS" AND ALCOA EXPRESSLY DISCLAIMS, AND WILL HAVE NO OBLIGATION OR LIABILITY FROM THIS AGREEMENT WITH REGARD TO, WITHOUT LIMITATION, THE ALCOA TECHNOLOGY AND KNOW-HOW OR THE USE THEREOF FOR ANY (1) IMPLIED WARRANTY OF MERCHANTABILITY; (2) IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; AND (3) ANY WARRANTY OF NON-INFRINGEMENT AND ANY WARRANTY OF ANY OTHER TYPE. ANY TECHNOLOGY AND KNOW-HOW OF NOVELIS DISCLOSED TO ALCOA PURSUANT TO THIS AGREEMENT IS DISCLOSED "AS IS" AND NOVELIS EXPRESSLY DISCLAIMS, AND WILL HAVE NO OBLIGATION OR LIABILITY FROM THIS AGREEMENT WITH REGARD TO, WITHOUT LIMITATION, ANY TECHNOLOGY AND KNOW-HOW OF NOVELIS FOR ANY (1) IMPLIED WARRANTY OF MERCHANTABILITY; (2) IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; AND (3) ANY WARRANTY OF NON-INFRINGEMENT AND ANY WARRANTY OF ANY OTHER TYPE.

  6.3 TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH PARTY DISCLAIMS AND SHALL HAVE NO OBLIGATION OR LIABILITY TO THE OTHER PARTY FOR ANY TYPE OF INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING OUT OF ANY BREACH OF WARRANTY OR OTHERWISE UNDER THIS AGREEMENT (WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE OR BREACH OF STATUTORY DUTY) OR OTHERWISE) EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, WHETHER ARISING UNDER THEORY OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE. IN NO EVENT WILL EITHER PARTY'S MAXIMUM LIABILITY HEREUNDER EXCEED THE TOTAL PAYMENTS

PAID BY NOVELIS TO ALCOA IN CONNECTION WITH THIS AGREEMENT IN THE TWELVE MONTHS IMMEDIATELY PRIOR TO ANY CLAIM.

**Article 7.     Indemnification.**

7.1     Novelis will indemnify and hold Alcoa harmless from and against any and all claims, damages, liabilities, losses, costs and expenses, including, without limitation, legal expenses and reasonable counsel fees, arising out of or incidental to or in any way resulting from:  (i) a breach of Novelis' representations and warranties under this Agreement; (ii) any customer's use of coils utilizing the Alcoa 951 Pretreatment Process produced by Novelis; (iii) Novelis' unauthorized use and/or commercialization of the coils utilizing the Alcoa 951 Pretreatment Process; and (iv) any personal injury, illness, death or property damage that arises out of or relates to the sale of coils utilizing the Alcoa 951 Pretreatment Process by Novelis, improper business practices, or Novelis' negligent or willful acts or omissions or those of Novelis' directors, officers, employees, or agents.

7.2     Alcoa will indemnify and hold Novelis harmless from and against any and all claims, damages, liabilities, losses, costs and expenses, including, without limitation, legal expenses and reasonable counsel fees, arising out of or incidental to or in any way resulting from:  (i) a breach of Alcoa's representations and warranties under this Agreement; (ii) Alcoa's unauthorized use and/or commercialization of the Novelis Confidential Information; (iii) any personal injury, illness, death or property damage that arises out of or relates to the sale of coils utilizing the Alcoa 951 Pretreatment Process by a party other than Novelis, improper business practices, or Alcoa's negligent or willful acts or omissions or those of Alcoa's directors, officers, employees, or agents; and (iv) a claim by a third party that the Alcoa Technology and Know-How, the 951 Chemicals or coils utilizing the Alcoa 951 Pretreatment Process infringe the intellectual property rights of such third party.

7.3     Promptly after receipt by a Party of a notice of commencement of any action involving the subject matter of the foregoing indemnity provisions under Sections 7.1 or 7.2, such Party will promptly notify the other Party of the commencement thereof.  Upon proper notification, the indemnifying Party shall have the right, but not the obligation, to control the defense against any such third party claims, utilizing counsel chosen in the indemnifying Party's discretion, provided that the indemnified Party may participate in any such defense, at its own expense, by separate counsel of its choice, and further provided that any such participation shall not limit the indemnifying Party's right to control such defense.  Notwithstanding anything contained in the foregoing sentence to the contrary, the indemnifying Party (i) shall not be entitled to have sole control over any third party claim that seeks an order, injunction or other equitable relief against the indemnified Party; or any action that is the subject of such third party indemnification claim in which both Parties are named as parties and either Party determines with advice of counsel that there may be one or more legal defenses available to it that are different from or additional to those available to the indemnifying Party or that a conflict of interest between the Parties may exist in respect of such action, and (ii) shall obtain the prior written approval of the indemnified Party before ceasing to defend against any third party indemnification claim or entering into any settlement, adjustment or compromise of such claim involving injunctive or similar equitable relief being asserted against the indemnified Party. The indemnified Party shall cooperate with the indemnifying Party in the provision of any such

defense by providing to the indemnifying Party all such information, assistance and authority as may reasonably be requested by the indemnifying Party.

Article 8.    Term and Termination.

8.1    **Term.** This Agreement shall commence upon the Effective Date and continue until the earlier of the termination of Novelis' participation in the Ford Motor Company P552 Program or the date this Agreement is terminated by either Party in accordance with the terms of this Article 8.

8.2    **Termination for Breach.** Either Party will be entitled to terminate this Agreement by written notice to the other Party in the event the other Party is in material breach of any of its obligations hereunder and shall fail to remedy any such breach within thirty (30) days after notice thereof by the non-breaching Party.

8.3    **Termination upon the Occurrence of Certain Events.** Either Party may terminate this Agreement immediately upon notice to the other Party in the event that: (i) the other Party files a petition in bankruptcy, reorganization or similar proceeding or is adjudicated a bankrupt; (ii) a petition in bankruptcy is filed against the other Party and such petition is not removed or resolved within thirty (30) days; (iii) the other Party becomes insolvent or makes an assignment for the benefit of its creditors or an arrangement for its creditors pursuant to any bankruptcy law; (iv) the other Party discontinues its business; or (v) a receiver is appointed for the other Party or its business.

8.4    **Effect of Termination or Expiration of this Agreement.**

    **8.4.1    Continued Payments.** In the event of the expiration or termination of this Agreement for any reason, Novelis shall make all payments due and accrued to Alcoa up and until the effective date of termination of this Agreement. For the avoidance of doubt, Novelis shall have an obligation to continue to pay royalties for any of its sales of coils utilizing the Alcoa 951 Pretreatment Process produced by Novelis and sold for the Ford Motor Company P552 Program during the Sell-Off Period described in Section 8.5.2 (if applicable).

    **8.4.2    Disposal of Inventory.** Within ten (10) days following the termination of this Agreement for any reason whatsoever including the expiration of the term hereof, and on the last day of each month during the disposal period set forth below, Novelis shall furnish to Alcoa a certificate of Novelis listing its inventories of coils utilizing the Alcoa 951 Pretreatment Process on hand and in process wherever situated. Alcoa or Alcoa's designee shall have the right to conduct a physical inventory of said coils in Novelis' possession or under Novelis' control. Novelis may, for up to ninety (90) days after the effective date of termination (the "Sell-Off Period"), sell all said coils which may be in inventory and not sold. If during the Sell-Off Period, Novelis fails timely to render any required accounting statements or to make all payments when due, Novelis' disposal rights hereunder shall immediately terminate without notice.

    **8.4.3    Survival of Obligations; Return of Confidential Information.** Notwithstanding any expiration or termination of this Agreement, Section 2.3.3, Articles 4, 5, 6, and 7, this Section 8.5.3 and Article 9 shall survive and continue to be enforceable as set forth

herein. No termination of this Agreement, in whole or in part, shall affect Alcoa's rights to royalties, reports, and the examination of Novelis' books during the applicable Audit Period until all required royalties have been paid. Except as needed to sell coils utilizing the Alcoa 951 Pretreatment Process produced by Novelis and sold for the Ford Motor Company P552 Program during the Sell Off Period, upon any expiration or termination of this Agreement pursuant to Article 8, Novelis shall promptly return to Alcoa all Confidential Information, and all copies thereof. Except as set forth herein for the duration of the Ford Motor Company P552 Program, this Agreement shall not be construed to and is not intended to competitively disadvantage Novelis or otherwise affect Novelis' rights after the expiration of the Alcoa Patents.

**Article 9. Miscellaneous.**

9.1 **Governing Law; Venue.** This Agreement shall be governed by and interpreted in accordance with the laws of the Commonwealth of Pennsylvania without regard to its conflicts of law principles. The Parties agree that any suit or action arising out of this Agreement shall be heard in a court of competent jurisdiction located in Allegheny County, Pennsylvania to which jurisdiction the Parties hereby exclusively submit.

9.2 **Waiver.** The waiver by any Party of a breach or a default of any provision of this Agreement by any other Party shall not be construed as a waiver of any succeeding breach of the same or any other provision, nor shall any delay or omission on the part of a Party to exercise or avail itself of any right, power or privilege that it has or may have hereunder operate as a waiver of any right, power or privilege by such Party.

9.3 **Waiver of Jury Trial.** TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHT OF TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY MATTER ARISING HEREUNDER.

9.4 **Notices.** Any notice or other communication under this Agreement shall be effective when delivered in person or, if mailed, when deposited in the mail by registered or certified mail, return receipt requested or, if transmitted by facsimile, when faxed by means confirming receipt, addressed to the other Party as follows:

| If to Alcoa: | If to Novelis: |
|---|---|
| Ainsworth (Andy) B. Mills | General Counsel, Novelis Inc. |
| 5600 N. River Road, Suite 620 | 3560 Lenox Road, Suite 2000 |
| Rosemont, IL 60018 | Atlanta, GA 30326 |
| Tel.: 202-841-2359 | Tel.: 404-760-4070 |
| Fax: 563-459-1210 | Fax: 404-760-0137 |

9.5 **No Agency.** Nothing herein shall be deemed to constitute Alcoa, on the one hand, or Novelis, on the other hand, as the agent or representative of the other, or as joint venturers or partners for any purpose. Neither Alcoa, on the one hand, nor Novelis, on the other hand, shall be responsible for the acts or omissions of the other. No Party will have authority to

speak for, represent or obligate the other Party in any way without prior written authority from such other Party.

9.6 **Export Control and Requirements.**

9.6.1 Novelis agrees to comply with all applicable U.S. export control laws and regulations, specifically including, but not limited to, the requirements of the Arms Export Control Act, 22 U.S.C. 2751-2794, including the International Traffic in Arms Regulation (ITAR), 22 C.F.R. 120 et seq.; and the Export Administration Act, 50 U.S.C. 2401-2420, including the Export Administration Regulations, 15 C.F.R. 730-774; including the requirement for obtaining any export license or agreement, if applicable. Without limiting the foregoing, Novelis agrees that it will not transfer or disclose any information it receives from Alcoa that constitutes an export controlled item, data, or service to foreign persons employed by or associated with, or under contract to Novelis or Novelis' suppliers, without the authority of an export license, agreement, or applicable exemption or exception.

9.6.2 Novelis shall immediately notify Alcoa if it is, or becomes, listed in any Denied Parties List or if Novelis' export privileges are otherwise denied, suspended or revoked in whole or in part by any U.S. Government entity or agency.

9.7 **Entire Agreement.** This Agreement contains the full understanding of the Parties with respect to the subject matter hereof and supersedes all prior understandings and writings relating thereto. No waiver, alteration or modification of any of the provisions hereof shall be binding unless made in writing and signed by the Parties.

9.8 **Headings.** The headings contained in this Agreement are for convenience of reference only and shall not be considered in construing this Agreement.

9.9 **Severability.** In the event that any provision of this Agreement is held by a court of competent jurisdiction to be unenforceable because it is invalid or in conflict with any law of any relevant jurisdiction, the validity of the remaining provisions shall not be affected and the invalid provision shall be severed here from.

9.10 **Assignment.** Neither Party may assign or otherwise transfer this Agreement or any of its rights or obligations hereunder without obtaining the other Party's prior written consent, which may not be unreasonably withheld, conditioned, or delayed. Any purported assignment or other transfer without such consent shall be void. The Party assigning or otherwise transferring this Agreement or its rights or obligations hereunder shall continue to be liable for all of its obligations under this Agreement following any such assignment or other transfer, unless the Parties agree in writing otherwise. Notwithstanding the foregoing, nothing in this Paragraph 9.10 shall restrict or interfere in any way with Alcoa's 951 Commercialization as per Paragraph 3.5.1.

9.11 **Force Majeure.** If, as a result of unforeseeable circumstances, acts (including a delay or failure to act) of any governmental authority (de jure or de facto), war (declared or undeclared), riot, revolution, fires, floods, strikes, labor disputes, sabotage, epidemics, and failures of electrical, telecommunications or computer facilities or networks, or similar causes beyond the reasonable control of a Party (a "**Force Majeure**"), such Party is unable to perform

or is materially delayed in the performance of any of its obligations hereunder, such failure or delay shall not be deemed a breach of this Agreement, but such obligations shall remain in full force and effect and shall be performed or satisfied pursuant to this Agreement, as soon as legally and practically possible after the termination of the Force Majeure.

9.12  **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of such together shall constitute one and the same instrument.

**IN WITNESS WHEREOF**, each Party has caused this Agreement to be executed in its name by its properly and duly authorized officer or representative as of the date first above written.

**Alcoa Inc.**                                              **Novelis Inc.**

By: _____                By: _____

Name: Mark J. Vrablec                              Name: BRAD SOULTZ

Date: August 20, 2012                               Date: 16 Aug 2012

# ATTACHMENT A
# ALCOA TECHNOLOGY AND KNOW-HOW

As defined in Section 1.1 above, the Alcoa Technology and Know-How are outlined as follows below:

- U.S. Patent 5,463,804

- U.S. Patent 6,167,609

- Alcoa Material Data Safety Sheet for Alcoa 951 Pretreatment Bath

- Total concentration of all components in Alcoa 951 Pretreatment Bath

- Relative ratios of all components in Alcoa 951 Pretreatment Bath

- Optimized operating conditions for Alcoa 951 Pretreatment Bath

- Process control procedures for Alcoa 951 Pretreatment Bath

- Product quality control procedures and Process FMEA (PFMEA) for Alcoa 951 pretreated aluminum

- Acceptability ranges for parameters associated with product quality control procedures for 951 pretreated aluminum

- Performance data associated with adhesive bonding with Alcoa 951 pretreatment (including data from batch, small scale and full scale pretreatment trials)

First Amendment to

Technology Access & License Agreement

This First Amendment ("Amendment") effective as of August 30, 2013 (the "Effective Date") to the Technology Access and License Agreement, is made, by and between Alcoa Inc., a Pennsylvania corporation through its Alcoa Technical Center, with offices located at 100 Technical Center Drive, Alcoa Center, Pennsylvania 15069, and its Global Aerospace, Transportation, Industrial and Specialty Products business unit, with offices located at 4879 State Street, Bettendorf, IA 52722 USA (Collectively, "Alcoa"), and Novelis Inc., a Canadian corporation with offices at 3560 Lenox Road, Atlanta, Georgia 30326 USA ("Novelis"). Alcoa and Novelis being individually or collectively hereinafter referred to as "Party" or "Parties."

RECITALS

WHEREAS, the Parties entered into the Technology Access and License Agreement (the "Agreement") effective August 15, 2012; and

WHEREAS, the Parties desire to enter into this Amendment to the Agreement in order to revise certain obligations of non-analysis in order to exchange sample coils of aluminum sheet that was originally not expected to occur under the non-analysis provisions established by the Parties under the Agreement.

NOW THEREFORE, in consideration of the mutual covenants and promises contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties agree to amend the Agreement as follows:

1. After Section 1.14, insert the following new text:

    1.15 "Alcoa Sample Coils" means coils of aluminum sheet provided to Novelis to test the Alcoa 951 pretreatment process on the Novelis Oswego production line.

2. After New Section 1.15 above, insert the following new text:

    1.16 "Novelis Sample Coils" means coils of aluminum sheet provided to Alcoa to test the Alcoa 951 Pretreatment Process on the Alcoa Davenport production line.

3. After Section 4.5, insert the following new text:

    4.6 During the term of this agreement Alcoa will provide sample coils to Novelis and Novelis will provide sample coils to Alcoa for the purpose of benchmarking the Alcoa 951 Pretreatment Process at the Novelis Oswego and Alcoa Davenport production facilities, and to confirm that the new processes, in the event of a line shut down, are suitable temporary supply back-up options for the other company, relative to surface performance. Novelis will not analyze Alcoa Sample Coils, and Alcoa will not analyze Novelis Sample Coils to determine metallurgy, temper, surface quality or other properties not specifically related to the Alcoa 951 pretreatment process. The

type and quantity of the samples shall be at the sole discretion of each party providing the samples. The submission of coil samples is neither a sale nor offer for sale and coils samples are provided for experimental purposes only. Both parties agree to disclose to the other the testing data and results of all tests involving the sample coils. The results shall constitute Confidential Information of the party that provides the results, and both parties agree to maintain and protect the confidential nature of the results in accordance with the terms set forth herein. Once all testing is completed, Novelis will ensure the scrap and melting of the Alcoa Coil Samples and Alcoa will ensure the scrap and melting of the Novelis Coil Samples.

4. **Counterparts.** This Amendment to the Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of such together shall constitute one and the same instrument.

5. The Parties make no other amendments to the Agreement.

IN WITNESS WHEREOF, each Party has caused this Agreement to be executed in its name by its properly and duly authorized officer or representative as of the date first above written.

Alcoa Inc.

By: _____

Name: Mark J. Vrablec

Date: October 7, 2013

Novelis Inc.

By: _____

Name: BRADLEY SCHULTZ

Date: 30 Aug 2013