# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ARCONIC CORP., | : |
| and | : Civil Action No. 2:17-cv-1434-JFC |
| HOWMET AEROSPACE INC., | : JURY TRIAL DEMANDED |
| Plaintiffs and Counterclaim-Defendants | : Senior District Judge Joy Flowers Conti |
| vs. | : |
| NOVELIS INC., | : |
| and | : |
| NOVELIS CORP., | : |
| Defendants and Counterclaim-Plaintiffs | : |

**ARCONIC'S SUPPLEMENTAL STATEMENT REGARDING
PENNSYLVANIA CONTRACT LAW AND ANTITRUST DAMAGES PRINCIPLES**

Arconic respectfully submits this supplemental brief to address the issues identified by the Court during the June 29, 2022 *Daubert* hearing: (1) whether Pennsylvania law requires contract damages awards to account for "passed-on" damages or other benefits attributable to an alleged breach; and (2) whether the price Novelis paid for A951 in the real world speaks to the price it would be willing to pay in a but-for world without the alleged price restraint.  June 29, 2022 Minute Entry.

## I. DAVIS'S FAILURE TO ACCOUNT FOR NOVELIS' "PASSED-ON" DAMAGES IS CONTRARY TO PENNSYLVANIA CONTRACT LAW.

Arconic has moved to exclude Julie Davis's opinions on contract damages because her opinions are based on antitrust law rather than Pennsylvania contract law.  Dkt. 860 at 2, 11-12.  As explained in Arconic's motion, there are significant differences between the law of antitrust damages and the law of contract damages.  *Id.* at 11-13.  Antitrust law explicitly allows plaintiffs to recover for damages they did not suffer and prevents defendants from reducing a damages award based on costs that were "passed on" to other parties.  Pennsylvania contract law says the opposite, and states that contract plaintiffs are only entitled to recover the amount of *actual* loss attributable to the alleged breach.  This issue is relevant to Davis's damages analysis since ███████████████████ ██████████████████████████████, and thus avoided those costs.  Davis assumed (incorrectly) that antitrust rules regarding "pass-through" damages apply to claims for breach of contract under Pennsylvania law.  At the *Daubert* hearing, the Court asked Arconic to provide authority to support its position that, under Pennsylvania law, Novelis is only entitled to recover the net loss it suffered because of the alleged breach, and that contract damages must be reduced by any benefits caused by the purported breach.[1]

---

[1] In its opening brief, Arconic cited federal cases applying Pennsylvania law.  *See* Dkt. 860 (Arconic Brief) at 12 (describing Pennsylvania law and citing cases applying Pennsylvania law).

Under Pennsylvania law regarding expectation damages, "[t]he purpose of a [contract] damage award is to place the non-breaching party 'as nearly as possible in the *same* position [it] would have occupied had there been no breach.'" *Helpin v. Trs. of Univ. of Pennsylvania*, 608 Pa. 45, 50 (2010) (emphasis added); *ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 669 (3d Cir. 1998) (same, applying Pennsylvania law); Dkt. 860 (Arconic Brief) at 12 (describing Pennsylvania law and citing cases applying Pennsylvania law). In applying that rule, Pennsylvania cases are clear that damages awards should not place plaintiffs in a *better* position than they would have been absent a breach. *Helpin,* 608 Pa. at 51 (as to expectation damages, "[t]he aggrieved party can recover nothing more than will compensate him."); *William B. Tanner Co. v. WIOO, Inc.*, 528 F.2d 262, 271 (3d Cir. 1975) (same, applying Pennsylvania law); *cf. Trosky v. Civil Serv. Comm'n, City of Pittsburgh*, 539 Pa. 356, 366 (1995) (rejecting damages award because it placed the plaintiffs "in a better position than they would have been in" absent a statutory violation). As Pennsylvania courts have explained, the purpose of expectation damages is "to make the non-breaching party whole again, not to provide him with a windfall." *Bellefonte Area Sch. Dist. v. Lipner*, 81 Pa. Cmwlth. 334, 339 (1984). These principles of contract law are not unique to Pennsylvania, and are consistent with principles articulated in the Restatement (Second) of Contracts and by courts around the country.[2]

To fulfill this purpose, contract damages awards should compensate for the actual loss (the net loss) suffered by the plaintiff, but should not extend beyond that to include amounts not lost or damages not actually suffered. Thus, a contract damages award must offset any purported losses

---

[2] *See* Restatement (Second) of Contracts § 344 (1981); *Trosky*, 539 Pa. at 363 (favorably citing the Restatement (Second) of Contracts); Dkt. 860 (Arconic Br.) at 12 (citing cases and treatises). As discussed at the hearing, the Federal Circuit case on which Novelis relies is not controlling and is part of a broader line of cases that supports Arconic's position. *See* Dkt. 916 at 4-5.

from a breach by any gains attributable to the breach; in other words, it must be reduced by the amount of "any savings or other benefits [the plaintiff obtained] from the defendant's non-performance." *Source Healthcare Analytics, Inc. v. SDI Health LLC*, 2014 WL 8864942, at *15 (Pa. Com. Pl. Jan. 14, 2014); *see also ATACS*, 155 F.3d at 669 (same, applying Pennsylvania law).

Novelis does not dispute that, because of the alleged breach (the price of A951 in the Arconic-Chemetall agreement), it was able to secure ████████████████████████ ██████████████████████. In other words, Novelis ██████████████████████████ ████████████████████████████. Yet, Davis purported to calculate damages for this alleged breach of contract based solely on the increase in the price of A951 to Novelis and did not deduct ████████████████████████████████. Thus, Davis' damages claim, if accepted, would result in an improper windfall – Novelis would receive the full difference between the claimed contract price and the actual price paid (i.e., the full amount of the purported contract overcharge), *plus* the additional amount ████████████████████████████████. This is contrary to law and therefore unreliable under Daubert.

At the hearing, Novelis suggested – for the first time – that it might have been able to ████████████████████████████████████████████████████████████████████ (a higher price being charged by Arconic), and that the adder therefore does not need to be considered for contract damages. Ex. 1 (6/29/22 Hr'g Tr.) at 84:5-8. As an initial matter, this argument is procedurally improper, as it was not included in Novelis' brief and, in fact, conflicts with Novelis' repeated admissions that ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████," Dkt. 856-10 (Novelis interrogatory responses) at 55. *In re Grand Jury*, 635 F.3d 101, 105 n.4 (3d Cir. 2011) ("[A]n argument brought up for the first time at oral argument is waived.").

3

But in any event, this argument cannot save the reliability of Davis's analysis of contract damages.  Regardless of whether (contrary to the evidence) some portion of the "adder" could have been attributed to other factors, Davis's failure to address it at all makes her analysis unreliable and contrary to law.  Indeed, Davis explained that her decision to ignore the pass-through was based *solely* on instructions from Novelis' counsel regarding the law of antitrust damages (which does not govern contract damages) – and was not based on any economic analysis or uncertainty as to the facts.  Arconic Br. at 13.  And, contrary to counsel's suggestion now that Novelis would have secured an adder anyway, Davis only identified *one* explanation for the adder – she explained that Novelis ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌."  Dkt. 848-4 (Davis Rebuttal) at 49.  In short, Novelis' new argument is contrary to its own expert's factual conclusions.  Davis's failure to address the adder in her damages analysis renders her analysis contrary to law and unreliable.  *Daubert* requires experts to base their analysis on sound methodologies – not unspoken and late-disclosed attorney speculation.

## II. THE PRICE NOVELIS PAID FOR A951 IN THE REAL WORLD IS THE SAME AS THE PRICE NOVELIS WOULD BE WILLING TO PAY IN THE BUT-FOR WORLD, AND THUS INFORMS THE BUT-FOR PRICE.

During the *Daubert* hearing, the Court requested supplemental briefing and authorities to support Arconic's view that there is a connection between the price Novelis paid for A951 in the real world and the price Novelis would be "willing[] to pay" for A951 in a but-for world without the alleged price restraint.  June 29, 2022 Minute Entry.  As explained below, because any change in the pricing terms between Arconic and Chemetall would have no impact on the economic value of A951 to Novelis – which profited handsomely from selling A951-treated aluminum to Ford – Novelis' willingness to pay for A951 would be unaffected in the but-for world in the absence of the alleged price restraint.  Neither Davis nor Chipty disputed this – nor

4

could they.  Yet their analysis fails to account for this undisputed economic fact – and therefore does not pass *Daubert* muster.

      **A.**      **The Price Novelis Actually Paid Shows That Novelis Was Willing to Pay That Much In The But-For World.**

The phrase "willingness to pay" is an economic term that refers to the maximum price a consumer will pay for a good.  *See* N. Gregory Mankiw, *Principles of Economics* 132 (Jane Tufts, ed., 9th ed. 2020) (defining willingness to pay as "the maximum amount that a buyer will pay for a good").  When a seller has the exclusive right to sell a particular good or service – as Arconic and Chemetall indisputably did with respect to A951 chemicals and know-how – "the profit-maximizing price is determined by the *willingness to pay* of end-use consumers."  *See* Areeda & Hovenkamp ¶ 1003a (emphasis added).  In a case like this one – where price is set through individual negotiations – the goal of the seller is always to obtain a price as close to the buyer's willingness-to-pay as it can. (And the buyer's goal is to pay as far *below* its willingness-to-pay – as close to the seller's minimum price – as *it* can.)

An antitrust overcharge damages analysis compares the price that was charged in the real world with the price that would be charged in a "but-for" world without the challenged anticompetitive conduct.  Dkt. 860 at 6.  The Court's request for briefing was based on the concern – expressed at the hearing – that if the price paid in the real world was imported into the but-for world as a price the buyer was willing to pay, then charging the buyer that "willing to pay" price would never result in any antitrust damages.  Ex. 1 (6/29/22 Hr'g Tr.) at 63:23-64:24. This is based on a fundamental misconception that the but-for-world price necessarily depends on (or is the same as) a buyer's willingness to pay.  But the two are distinct concepts.  This is easy to see in the case of a price-fixing conspiracy.  If all of the sellers of bottled water conspire, they may be able to elevate the market price.  A consumer who buys water at that elevated price,

by definition, is willing to pay that elevated price (or perhaps much more).  In the absence of the unlawful conspiracy, however, competition would drive the market price below the price that the consumer paid.  The difference between that competitive price and the inflated price would be the measure of damages.  And the consumers' willingness to pay is beside the point; the consumer in that but-for world would still be *willing* to pay more, but other factors would drive the price down.

In *this case*, however, Novelis' willingness to pay *does* matter because there is nothing that would drive the but-for price down below what Novelis is willing to pay; its willingness to pay therefore was a factor that Davis (and Chipty) needed to consider in their analysis of the but-for-world price.  In the but-for world, as in the real world, Novelis would have to bargain for the right to use the A951 chemical and know-how.  In the but-for world, as in the real world, Novelis would sell A951-treated aluminum to Ford.  In the but-for world, as in the real world, Arconic has every right and every incentive to maximize its royalties from the sale of A951 chemicals and related know-how to Novelis.

We know that in the real world, Novelis was willing to pay at least $█████, because it did – Novelis knew exactly what it was paying for and determined ██████████ it was in its self-interest to pay that price for A951 because it could ████████████████ selling A951-treated aluminum to Ford.  The but-for world at issue here would be identical to the real world, except that it would not include the alleged "████████████████████████████████ (the alleged anticompetitive conduct).  *See* ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues* 89 (3d ed. 2017) (when calculating antitrust damages, one must assume "that the antitrust violation did not occur and **hold[] every other feature of the actual world constant**") (emphasis added).  Accordingly, Novelis would *still* be willing to pay

6

$▮ for A951, as it would be the same product, offered by the same sellers, for resale to the same buyer, for the same substantial profits. Davis does not provide any economic reason as to why the price Novelis would be willing to pay would be lower in the but-for world – nor does Chipty. *See Blue Cross & Blue Shield United v. Marshfield Clinic*, 152 F.3d 588, 594 (7th Cir. 1988) (Posner, J.) ("If [an illegal collusive practice] added nothing to the price effects of the legal practices, it did not cause [the plaintiff] any harm."). On the contrary, Davis conceded that

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████████

**B.     Novelis' Experts Failed To Consider Novelis' Willingness To Pay, Which Must Be Considered In Determining The But-For Price, Making Their Opinions Unreliable.**

Both Davis – in estimating damages – and Chipty – in opining on competitive effects – needed to take account of Novelis' willingness to pay, but failed to do so.

**1.**     First, as to damages, if one assumes – in accord with established antitrust economic principles – that Arconic would act rationally, it follows that, as the world's only supplier of A951 know-how, it would seek to maximize its profits from the sale of A951. Accordingly, if – as both Davis and Chipty conceded – Novelis would still be willing to pay $▮ in the but-for world, Arconic would not have any incentive to allow Novelis to obtain A951 chemicals and know-how for less than (at least) $▮, Novelis' demonstrated willingness-to-pay. *See* Areeda & Hovenkamp ¶ 1003a; *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1402 (7th Cir. 1989); *see also Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438 (2009) (holding that "a firm with no duty to deal ... has no

7

obligation to deal under terms and conditions favorable to its competitors" when it does). Thus, the but-for price must be determined with reference to what Novelis would be willing to pay.

If the challenged pricing terms in the agreement at issue here were eliminated, presumably another negotiation would ensue to set both the price to Novelis and the share of the price that Arconic and Chemetall would receive. And again, in that negotiation, whatever the division of revenues and profits between Arconic and Chemetall, Arconic would have no reason to leave money on the table by reducing the price that Novelis would pay. Yet all of Davis's damages estimates depend on the assumption that Arconic would agree to give Novelis a price break in the but-for world. Yet why would it? Again, there is no dispute that Novelis would still be willing to pay $■■■ – or, ■■■■■■■■■ – to obtain A951. Davis gives no reason – none – that in the but-for world, Arconic would agree to any arrangement that did not require Novelis to pay *at least* $■■■, the price it was willing to pay.

These facts show why Davis's overcharge analysis is methodologically flawed: under basic economic principles, Davis was required to consider the price Novelis was willing to pay for A951 when setting the but-for price; Davis did not consider the price Novelis was willing to pay; therefore, Davis's opinions are unreliable.[3]

2.   Much the same analysis applies to Chipty's opinions regarding anti-competitive effects. If the challenged pricing terms in the agreement between Arconic and Chemetall did not cause Novelis to pay higher prices in the real world than it would have paid in a world without those pricing terms, there can be no anticompetitive effect. *See* Areeda & Hovenkamp ¶ 395.

---

[3] The Court's order only asked about the willingness to pay issue. There are other independent reasons as to why Davis's overcharge analysis should be excluded. For example, even if the real-world price were irrelevant to the but-for price (an outcome that would be contrary to basic economics in these circumstances), Davis's analysis suffers from the separate flaw of failing to consider or analyze profit maximizing behavior. *See* Dkt. 860 at 6-8; Dkt. 916 at 2-3.

Yet it is simply undisputed that Arconic had the exclusive right to A951 know-how, and it had every right to charge for that know-how the maximum amount that it could secure.[4] Because no expert has ever contested that Novelis was willing to pay at least $ ▮ – *in the but-for world as in the real world* – there is simply no reason that Arconic would agree to any contractual arrangement in which Novelis would pay any lower but-for price.  Rather, Arconic would want to increase its royalty rather than guarantee Novelis a lower price.[5] Chipty's failure to consider that Arconic, if acting rationally to maximize its profit in the but-for world, would always charge the price that Novelis is willing to pay ($ ▮ ), means that her methodology is flawed and unreliable under *Daubert*.

---

[4] As Arconic will argue on summary judgment, that is why, fundamentally, there can be no antitrust claim here.  Novelis' complaint is merely that it paid more than it wanted to pay for A951 chemicals and know-how, but the right to obtain a return on one's investment in technology like A951 pretreatment "is not only not unlawful; it is an important element of the free-market system" which "induces risk taking that produces innovation and economic growth." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).

[5] In fact, ▮

9

Dated: July 13, 2022

Respectfully submitted,

/s/ Courtland L. Reichman

Sarah O. Jorgensen (*Pro Hac Vice*)
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
1201 West Peachtree Street, Suite 2300
Atlanta, GA 30309
Tel: (404) 609-1040
sjorgensen@reichmanjorgensen.com

Christine E. Lehman (*Pro Hac Vice*)
Connor S. Houghton (*Pro Hac Vice*)
David A. King Jr. (*Pro Hac Vice*)
Adam Adler (*Pro Hac Vice*)
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
1909 K Street, NW
Suite 800
Washington, DC 20006
Tel: (202) 894-7310
clehman@reichmanjorgensen.com
choughton@reichmanjorgensen.com
dking@reichmanjorgensen.com
aadler@reichmanjorgensen.com

Aaron M. Panner (*Pro Hac Vice*)
Collin R. White (*Pro Hac Vice*)
KELLOGG HANSEN TODD FIGEL & FREDERICK PLLC
1615 M Street, N.W., Suite 400
Washington, DC 20036
Tel: (202) 326-7900
apanner@kellogghansen.com
cwhite@kellogghansen.com

Courtland L. Reichman (*Pro Hac Vice*)
Caroline M. Walters (*Pro Hac Vice*)
Karlanna M. Lewis (*Pro Hac Vice*)
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, California 94065
Tel: (650) 623-1401
creichman@reichmanjorgensen.com
cwalters@reichmanjorgensen.com
klewis@reichmanjorgensen.com

Antoinette C. Oliver (PA I.D. #206148)
MEYER, UNKOVIC & SCOTT LLP
535 Smithfield Street, Suite 1300
Pittsburgh, PA 15222-2315
Tel: (412) 456-2800
aco@muslaw.com

*Attorneys for Plaintiffs Arconic Corp. and Howmet Aerospace Inc.*

## **CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that on July 13, 2022, the foregoing was electronically served and filed by use of the court's ECF system.

*/s/ Courtland L. Reichman*
