IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ARCONIC CORPORATION AND HOWMET AEROSPACE INC.**, | ) | CIVIL ACTION NO.  17-1434 |
| | ) | |
| | ) | JUDGE JOY FLOWERS CONTI |
| Plaintiffs and Counterclaim Defendants, | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **NOVELIS INC.** *and* **NOVELIS CORP,** | ) | |
| | ) | |
| Defendants and Counterclaim Plaintiffs. | ) | |

**MEMORANDUM OPINION**

I.      Introduction

Arconic Corporation and Howmet Aerospace, Inc. (collectively, "Arconic") and Novelis

Inc. and Novelis Corporation (collectively, "Novelis") are competitors in the aluminum industry.

Ford Motor Company ("Ford") decided to make its popular F-150 pickup truck with aluminum,

starting with the 2015 model year.  Arconic's A951 pretreatment process (the "A951

pretreatment process"), which is used to pretreat aluminum, was selected for exclusive use in the

Ford F-150 project (i.e., the "P552 Program").  Ford was unwilling to be dependent upon a sole

supplier.  As a condition of selection, therefore, Ford required Arconic to license its A951

technology to Novelis.  Arconic and Novelis entered into a Technology Access & License

Agreement dated August 15, 2012 (the "2012 License") (ECF No. 1-3).

Arconic initiated this lawsuit in 2017, alleging that Novelis disclosed Arconic's trade

secrets and confidential information.  Novelis filed numerous counterclaims.  Pending before the

court are summary judgment motions (ECF Nos. 988, 1003) filed by Arconic and Novelis.  The

court held oral argument on February 7, 2023.  (Transcript, ECF No. 1101, under seal).  Certain aspects of the summary judgment motions were referred to the special master for reports and recommendations ("R&Rs") (ECF No. 1065).  The issues addressed in this opinion were not submitted to the special master.

On March 8, 2023, pursuant to Federal Rule of Civil Procedure 56(f), the court provided Novelis an opportunity to show cause why summary judgment should not be granted in favor of Arconic with respect to counterclaims II and III, in which Novelis seeks to recover damages for alleged breach of the 2012 License.  The court explained as follows:

> In counterclaim II, Novelis seeks damages for Arconic's alleged wrongful termination of the 2012 License.  In counterclaim III, Novelis seeks damages for Arconic's alleged breach of the pricing provision in the 2012 License, ¶ 3.5.1.
>
> The 2012 License is governed by Pennsylvania law and triable issues concerning the 2012 License will be resolved by the court because the parties waived their rights to a jury trial.  §§ 9.1, 9.3.  It appears to the court that partial summary judgment should be granted in favor of Arconic on counterclaim II with respect to only nominal damages being available; and on counterclaim III, with respect to liability.

(ECF No. 1087 at 10).  Those issues had not been addressed in the parties' summary judgment briefing.

Novelis filed a response to the show cause order (ECF No. 1107) and a concise statement of material facts ("CSMF") and appendix in support (ECF Nos. 1108, 1109).  Arconic filed a brief and responsive CSMF, with an additional exhibit (ECF Nos. 1125, 1126).  Novelis filed a reply (ECF No. 1136) and the issues are ripe for disposition.

Although many of the related filings are sealed, the court concludes that this opinion will not be sealed.  The 2012 License is not sealed.  Some of the underlying facts (such as specific pricing details) will be generalized or omitted to protect sensitive corporate competitive information.

II.      Counterclaim II

In counterclaim II, Novelis seeks to recover damages it incurred as a result of Arconic's alleged wrongful termination of the 2012 License.  After commercialization, Arconic did not supply the A951 chemical composition to Novelis.  The third-party supplier, Chemetall US, Inc. ("Chemetall"), supplied those chemical compositions to Novelis and Chemetall continues to supply the A951 chemical composition to Novelis at the same price it charged prior to the alleged wrong termination.  Under those circumstances, it was unclear what, if any, damages Novelis suffered.  The court directed Novelis to show cause why partial summary judgment should not be granted in favor of Arconic on counterclaim II with respect to only nominal damages being available.

There is no dispute on that issue.  "Novelis agree[s] with the Court that partial summary judgment limiting Novelis to nominal damages on Counterclaim II is appropriate."  (ECF No. 1136 at 12).  Partial summary judgment will, therefore, be entered in favor of Arconic.  The court does not address any other aspects of counterclaim II (i.e., liability).

III.     Counterclaim III

In Counterclaim III, Novelis asserts two separate alleged breaches of ¶ 3.5.1 of the 2012 License: (1) Arconic failed to allow "market forces" to "dictate the price" at which Chemetall sold the A951 chemical composition; and (2) Arconic failed to "make commercially reasonable efforts to ensure that Novelis is not disadvantaged relative to any other competitor" in any agreement between Arconic and Chemetall commercializing the A951 pretreatment process.

The contract provision at issue in counterclaim III, ¶ 3.5.1, provides as follows:

3.5.1   Alcoa is exploring the broad-based commercialization of its Technology and Know-How through a licensed third-party chemical supplier.  In the event of such commercialization, Alcoa agrees to notify Novelis as per Paragraph 9.4 and the Parties agree that the following terms and conditions of this Agreement will be suspended Article 3.1.1(ii) (the annual lump sum of $50,000), Article 3.1.2 (Technology Access Fee); and Article 3.4 (Technical Support); however, Alco may agree to provide additional technical support to Novelis at Novelis' request and in Alcoa's sole reasonable discretion, subject to Alcoa's standard terms and conditions for the provision of consulting services.  **The parties acknowledge that upon said third-party commercialization of the Alcoa Technology and Know-How, market forces will dictate the price charged by said third-party for access to the 951 Chemicals and Alcoa Technology and Know-How.  Alcoa will make commercially reasonable efforts to ensure that Novelis is not disadvantaged relative to any other competitor in any agreement between Alcoa and such third-party commercializing the Alcoa Technology and Know-How.**

(ECF No. 1-3 ¶ 3.5.1) (Emphasis added).

A.  Standard of review

    In *Viancourt v. Paragon Wholesale Foods Corp.*, No. CV 20-628, 2023 WL 2726705

(W.D. Pa. Mar. 31, 2023), the court recently summarized the standard for considering motions

for summary judgment involving contract disputes:

    This Court "may grant summary judgment on an issue of contract interpretation if the contractual language being interpreted 'is subject to only one reasonable interpretation.' " *Atkinson v. Lafayette College*, 460 F.3d 447, 452 (3d Cir. 2006) (quoting *Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.*, 180 F.3d 518, 521 (3d Cir. 1999)). Even if certain terms of the contract are deemed ambiguous by the court, summary judgment may still be entered in favor of one of the parties if there are no genuine disputes of material fact and it is clear that one of the parties is entitled to judgment as a matter of law. *See McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005).

*Id.* at *14.

4

B.  Factual Background

The overall context of the 2012 License stems from Ford's efforts to develop its F-150 pickup truck as an aluminum-intensive vehicle.  Ford selected Arconic's A951 pretreatment process to use in the pretreatment of the aluminum for the F-150 pickup truck.  Arconic's A951 pretreatment process was the only process that satisfied Ford's testing requirements.  Ford, however, was unwilling to be dependent upon a sole supplier.  As a condition of acceptance, Ford required Arconic to license its A951 pretreatment process technology to its (larger) industry competitor, Novelis.  Arconic had no realistic choice but to give Novelis a license because Arconic lacked the capacity to supply Ford's needs by itself.  Novelis CSMF ¶¶ 3, 4.  On the other hand, if Arconic refused to license its A951 pretreatment process technology, Novelis would have been unable to participate in the P552 Program.

In the timeframe when Arconic and Novelis negotiated the 2012 License, the transition from a successful laboratory test of the A951 pretreatment process technology to a scalable high-volume manufacturing solution was a significant challenge.  Novelis had commercial experience using other aluminum pretreatments in Europe.  Ford, Arconic, and Novelis recognized that all parties were dependent upon each other to make the project a success.  Novelis CSMF ¶¶ 1, 2, 7, 12.

In the negotiations for the 2012 License, Novelis requested that Arconic assure Novelis with respect to applied rates and costs of chemicals; Arconic's negotiators understood the request and agreed in principle.  Novelis CSMF ¶ 13, 14, 17.  Novelis sought to protect itself with robust conditions in light of the value it added in commercializing the A951 pretreatment process.  Novelis CSMF ¶ 15.  Novelis' representative, Bradley Soultz ("Soultz"), testified about a specific negotiation in the commercialization paragraph to make sure "Novelis was not

disadvantaged in any way, be it in price or having our know-how that could help complete the development of the 951, be afforded to companies other than Alcoa or Novelis."  Novelis CSMF ¶ 22.  Novelis anticipated a cost-plus pricing model before and after commercialization.  Novelis CSMF ¶ 23.  Novelis' negotiators understood that "other than recognition of th[e] licensing [royalty] amount, which had been quantified, the price to Arconic and Novelis should be the same."  Novelis CSMF ¶ 27.

The 2012 License set forth precommercialization pricing terms (i.e., for the time period when Arconic supplied the A951 chemical composition directly to Novelis without a third-party chemical supplier).  For this time period, Arconic agreed to make commercially reasonable efforts to ensure that Novelis could satisfy its production requirements and supply obligations to Ford.

The 2012 License estimated the cost of the A951 chemical composition in units of dollars per gallon ($/gallon) and dollars per one thousand square feet of treated aluminum ($/kft2).[1] 2012 License ¶ 3.4.4.  Novelis was also required to pay Arconic a Technology Access Fee based upon a set price per pound of the total amount of coils utilizing the A951 pretreatment process and sold for the Ford P552 Program.  2012 License ¶¶ 3.1.2, 1.14.   If there was a material difference between the actual application rates or costs and those estimates, the parties agreed to meet and negotiate in good faith regarding an adjustment to the price.  *Id.*  The actual cost of the chemicals produced in very small batches by Arconic was less than the cost estimated in the 2012 License.  Soultz Deposition at 152.  Novelis anticipated that the commercialized price

---

[1] The parties expressed price terms in several different units of measurement.  The precommercialized prices in ¶ 3.1.2 of the 2012 License were expressed in units of dollars per pound of the coils using the A951 pretreatment process.  The 2012 License also provided an estimate for the price per gallon of the A951 chemical composition, with a conversion factor for dollars per pound of metal.  ¶ 3.4.4.  Other conversion factors (i.e., estimates about flow rates, scrap rates, metal yield, etc., *see* Soultz Deposition at 152) were used to estimate the price per 1000 square feet of A951 treated aluminum.

would go down due to economies of scale in purchasing the chemicals and having a set supply chain.  Novelis CSMF ¶ 25.

Novelis' negotiator, Soultz, testified about how the "market forces" provision in ¶ 3.5.1 of the 2012 License came about.  Soultz explained that the $/gallon figure in ¶ 3.4.4 was effectively a cap to enable the project to move forward.  (Soultz Deposition at 152, ECF No. 1109-1). Soultz explained that he wanted Novelis to continue to be protected by the same $/gallon cap after Arconic commercialized the A951 pretreatment process.  Soultz testified: "Alcoa was unable or unwilling, I don't know, to accommodate that, hence this [market forces] language."  Soultz Deposition at 161-162.  Soultz acknowledged that Arconic clearly did not agree to the cap.  *Id.* at 163.

The "market forces" language did not appear to be a primary focus of the negotiation. Soultz more clearly recalled the back and forth with respect to the "other competitor" provision. *Id.* at 162.  There were two aspects of concern to Soultz: (1) price; and (2) protection of Novelis' know-how about developing the A951 pretreatment process for high-volume application for Ford.

Ford required Arconic to commercialize its A951 pretreatment process through a third-party chemical supplier.  Arconic contemporaneously negotiated its licenses with Novelis and Chemetall.  Novelis CSMF ¶¶ 5, 6.  In October 2012, several months after Arconic and Novelis executed the 2012 License, Arconic entered into an agreement with Chemetall, a third-party chemical supplier, to commercialize the A951 pretreatment process (the "2012 Arconic-Chemetall Agreement").

Novelis contends that Arconic breached the 2012 License because the 2012 Arconic-Chemetall Agreement contained a revenue allocation and price floor provision:

3.1 While this Agreement is in effect, except as indicated elsewhere in this Agreement, Chemetall shall pay to Alcoa in US Dollars a Technology Access Fee of [ ] %[2] of the sales price based on surface area of material pretreated with 951 Chemicals, subject to adjustment pursuant to Section 3.1.1 of this Agreement ("Technology Access Fee"). Chemetall will retain the remaining [ ] % of the sales price, subject to adjustment pursuant to Section 3.1.1 of this Agreement. **If a product that is competitive to the Alcoa 951 Pretreatment Process significantly impacts the sale of 951 Chemicals**, the Parties agree to review and adjust the terms as outlined in Section 3.1.1 of this Agreement. **Chemetall may not sell 951 Chemicals at a price below the Target Price without the expressed written consent of Alcoa. Alcoa shall not unreasonably refuse to consent to reduction of the Target Price as needed to meet competition**.

(ECF No. 1109-5) (emphasis added).

As reflected in the text of the 2012 Arconic-Chemetall Agreement, the "price floor" is not unilateral. Per § 3.1, Chemetall was required to obtain Arconic's written consent to sell the A951 chemical composition below the Target Price, but Arconic could not unreasonably refuse to allow Chemetall to reduce the price to meet competition. (*See* bolded text above).

"Target Price" is defined in § 1.12 of the 2012 Arconic-Chemetall Agreement to mean "a price that is in the range of between [a price certain] and [a price certain] per 1,000 square feet of aluminum substrate that is produced utilizing the Alcoa 951 Pretreatment Process, as may be adjusted from time to time pursuant to Section 3.1.1 of this Agreement." (ECF No. 1109-5). Section 3.1.1 of the 2012 Arconic-Chemetall Agreement set up a periodic review process and itemized various factors that would impact pricing between Arconic and Chemetall, as follows:

3.1.1. A process for review of pricing structure shall allow for deviation from the Target Price, Technology Access Fee, and/or Rebate, based on certain factors, including without 1imitation expiration of the Alcoa Patents, patentable improvements to the Alcoa 951 Chemicals, existing pricing, geographic region, market influence, inflationary influence, raw material and manufacturing cost, overall economic factors, the competitive landscape or significant changes to the baseline IP as established at the first commercialization of the Alcoa 95l Pretreatment Process that warrant consideration in setting and/or revising pricing.

---

[2] The actual percentages were deleted by the court to maintain the confidential nature of the agreement.

(ECF No. 1109-5).

The 2012 Arconic-Chemetall Agreement set the price Arconic would pay for the A951

chemical composition (emphasis added):

> 3.1.3  During  the  term  of  this  agreement,  Chemetall  will  manufacture  951
> Chemicals and toll to Alcoa or its subsidiaries for Alcoa's internal use and net
> resale.  Chemetall **will price the 951 Chemicals at the Target Price consistent
> with other customers, returning or rebating [  ]% in lieu of the Technology
> Access Fee** to Alcoa ("Rebate"), provided that such rebate shall be in lieu of the
> Technology Access Fee set forth in Section 3.1 of this Agreement.  This charge will
> include  packaging,  overhead,  and  a  reasonable  amount  of  technical  support  to
> Alcoa-designated locations.

In other words, Arconic paid the same Target Price as other customers, but got a significant

rebate to reflect its royalty.

After Arconic and Chemetall entered into the 2012 Arconic-Chemetall Agreement,

Novelis no longer had a contractual relationship with Arconic with respect to the purchase of the

A951 chemical composition.  Novelis buys the A951 chemical composition directly from

Chemetall by purchase order.  *See* Opinion re Declaratory Judgment Act claims (ECF No. 1118

at 6).  There is no specific royalty payment paid by Novelis to Arconic.  Chemetall remits

royalties (defined as "Technology Access Fees") to Arconic as part of their split of total proceeds

from Chemetall's sale of the A951 chemical composition to third parties, including to Novelis

and others.  *Id.* at 7.

In October 2012, Chemetall sent a quote to Novelis listing the A951 chemical

composition's price at a set price per kft2 (the price per 1000 square feet of A951 treated

aluminum).  Novelis CSMF ¶ 46.  In a presentation to Novelis about A951 on December 2, 2013,

Chemetall noted that Arconic vetted "market pricing" at that price with Ford.  (ECF No. 1109-30

at 50).

Duane Fudge, the Chemetall senior director of product management with purview over

the A951 business, viewed Novelis as a "development partner" who contributed to the commercialization of the A951 pretreatment process.   Novelis CSMF ¶ 9.   At that time, there were frequent meetings involving representatives of Arconic, Novelis, Chemetall and Ford. (ECF No. 1109-9, Fudge Deposition at 471-72).[3]   Fudge proposed to reduce Novelis' price for the A951 chemical composition in recognition of Novelis' role as a development partner. (Fudge Deposition at 471-72).   Arconic agreed to the price reduction.   *Id.; see* Mills Deposition at 201, 209.   The price to Novelis was reduced for the reverse side of the aluminum sheet, which resulted in a blended rate lower than the price quoted by Chemetall to Novelis in October 2012. (History of Pricing, ECF No. 1109-31).

In November 2013, Arconic and Novelis met to discuss A951 pretreatment process pricing.   (ECF No. 1109-32).   Novelis was upset because the price quoted by Chemetall was almost three times Novelis' expectation based on the precommercialization prices in the 2012 License.   Novelis CSMF ¶ 48.   After that meeting, Arconic's representative, Andy Mills, recorded that Novelis told Arconic early in the process that it "did not want to be commercially disadvantaged compared to its competitors" and Mills "assured Novelis that, with the exception of the royalty fee, the cost of chemicals was consistent with the overall price that [Arconic] was paying, and the Novelis price was consistent with the price other customers would be paying." Novelis CSMF ¶ 49.   In 2014, Arconic, Novelis and Ford met and Novelis again expressed that the A951 pretreatment process pricing was three times higher than expected.   Novelis CSMF ¶ 50.

Novelis has paid the same price since 2014, despite several revisions in the revenue-sharing terms between Arconic and Chemetall.   Novelis pays Chemetall a rate for the A951

---

[3] The surrounding portions of Fudge's deposition may contain related testimony, but they were not provided by either party as part of the summary judgment record.

chemical composition higher than the rate paid by Arconic because Arconic does not pay a

royalty to itself.  *See* 2012 Arconic-Chemetall Agreement § 3.1.3  ("Chemetall will price the 951

Chemicals [to Arconic] at the Target Price consistent with other customers, returning or rebating

[a percentage to Arconic] in lieu of the Technology Access Fee").  Novelis pays Chemetall a rate

for the A951 chemical composition that is not higher than the rate paid by any Chemetall

customers, except for Arconic.


C.  General principles of contract interpretation

In *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 92–93 (3d Cir. 2001),

the Third Circuit Court of Appeals summarized the principles of contract interpretation under

Pennsylvania law:

> Pennsylvania contract law begins with the "firmly settled" point that "the intent of
> the parties to a written contract is contained in the writing itself." *Krizovensky v.*
> *Krizovensky*, 425 Pa.Super. 204, 624 A.2d 638, 642 (1993) (citing *Steuart v.*
> *McChesney*, 498 Pa. 45, 444 A.2d 659 (1982)). " 'Where the intention of the parties
> is clear, there is no need to resort to extrinsic aids or evidence,' " instead, the
> meaning of a clear and unequivocal written contract " 'must be determined by its
> contents alone.'" *Steuart*, 444 A.2d at 661 (quoting *East Crossroads Ctr., Inc. v.*
> *Mellon–Stuart Co.*, 416 Pa. 229, 205 A.2d 865, 866 (1965)). "[W]here language is
> clear and unambiguous, the focus of interpretation is upon the terms of the
> agreement as manifestly expressed, rather than as, perhaps, silently intended." *Id.*
> "Clear contractual terms that are capable of one reasonable interpretation must be
> given effect without reference to matters outside the contract." *Krizovensky*, 624
> A.2d at 642.
>
> A court may, however, look outside the "four corners" of a contract if the contract's
> terms are unclear: "[w]here the contract terms are ambiguous and susceptible of
> more than one reasonable interpretation, ... the court is free to receive extrinsic
> evidence, i.e., parol evidence, to resolve the ambiguity." *Id.* But because
> Pennsylvania presumes that the writing conveys the parties' intent, a contract
>
> > will be found ambiguous if, and only if, it is reasonably or fairly susceptible
> > of different constructions and is capable of being understood in more senses
> > than one and is obscure in meaning through indefiniteness of expression or
> > has a double meaning. A contract is not ambiguous if the court can determine

its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction.

*Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir.1995) (quoting *Samuel Rappaport Family Partnership v. Meridian Bank*, 441 Pa. Super. 194, 657 A.2d 17, 21–22 (1993)) (internal quotation marks omitted). To determine whether ambiguity exists in a contract, the court may consider "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir.1980).

Ambiguity in a contract can be either patent or latent. While a patent ambiguity appears on the face of the instrument, "a latent ambiguity arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous." *Duquesne Light*, 66 F.3d at 614 (citing *Easton v. Washington County Ins. Co.*, 391 Pa. 28, 137 A.2d 332 (1957)). A party may use extrinsic evidence to support its claim of latent ambiguity, but this evidence must show that some specific term or terms in the contract are ambiguous; it cannot simply show that the parties intended something different that was not incorporated into the contract. "[L]est the ambiguity inquiry degenerate into an impermissible analysis of the parties' subjective intent, such an inquiry appropriately is confined to 'the parties linguistic reference.' ... [T]he parties' expectations, standing alone, are irrelevant without any contractual hook on which to pin them." *Id.* at 614 & n. 9 (quoting *Mellon Bank*, 619 F.2d at 1011 n. 12) (emphasis added).

Furthermore, the alternative meaning that a party seeks to ascribe to the specific term in the contract must be reasonable; courts must resist twisting the language of the contract beyond recognition. "In holding that an ambiguity is present in an agreement, a court must not rely upon a strained contrivancy to establish one; scarcely an agreement could be conceived that might not be unreasonably contrived into the appearance of ambiguity. Thus, the meaning of language cannot be distorted to establish the ambiguity." *Steuart*, 444 A.2d at 663.

*Id.* at 92-93.  The court summarized the underlying principles as follows:

(1) mere disagreement between the parties over the meaning of a term is insufficient to establish that term as ambiguous; (2) each party's proffered interpretation must be reasonable, in that there must be evidence in the contract to support the interpretation beyond the party's mere claim of ambiguity; and (3) the proffered interpretation cannot contradict the common understanding of the disputed term or phrase when there is another term that the parties could easily have used to convey this contradictory meaning.

*Id.* at 94-95; *accord T.N. Incorporation, Ltd. v. Fid. Nat'l Info. Servs., Inc.*, No. CV 18-5552, 2022 WL 910092, at *4 (E.D. Pa. Mar. 29, 2022) ("terms are not rendered ambiguous merely because the parties squabble over their meaning.") (citing *Bohler-Uddeholm Am., Inc.*, 247 F.3d at 94-95).

As explained in *Brown v. Cooke*, 707 A.2d 231 (Pa. Super. Ct. 1998), "what a party now claims to have intended is not as important as the intent that we glean from a reading of the document itself. The parties' intent at the time of signing as embodied in the ordinary meaning of the words of the document is our primary concern." *Id.* at 233 (citing *Steuart*, 444 A.2d at 659).

D.  Discussion

1.  Market forces

a.  The parties' arguments

Novelis argues that the "market forces" provision in ¶ 3.5.1 of the 2012 License imposes a duty on Arconic to "not control and inflate the price Chemetall would charge" Novelis for the A951 chemical composition.  (ECF No. 1107 at 1).  The gravamen of Novelis' theory is that the existence and implementation of the price floor in the 2012 Arconic-Chemetall Agreement establishes that Arconic breached the "market forces" provision in the 2012 License because Arconic dictated Chemetall's price.

Arconic contends that the "market forces" provision is a nonbinding recital which does not commit either party to any specific conduct.  Arconic points out that Novelis' ability to negotiate a lower price shows market forces at work.  Arconic concedes that the last sentence of ¶ 3.5.1 (the "other competitor" provision) imposed a duty on Arconic to make commercially

reasonable efforts to ensure that Novelis was not disadvantaged relative to A951 customers other than Arconic, but contends there is no evidence that it failed to comply with that duty.

In reply, Novelis reiterates its contention that the price floor provision in the 2012 Arconic-Chemetall Agreement is a per se violation of the "market forces" provision. Novelis argues that the "market forces" provision is independently actionable and not a mere recital.

b.   Recitals in a contract

The key dispute with respect to Counterclaim III is whether the "market forces" provision is a recital or an operative provision. A recital is a provision that explains the circumstances surrounding an agreement and does not create a binding obligation. In *In re Scott (Scott v. U.S. Bank Natl. Assoc.)*, 600 B.R. 506, 509 (Bankr. W.D. Pa. 2019), the court explained:

> Ordinarily, "[r]ecitals in a contract, such as 'whereas' clauses, are merely explanations of the circumstances surrounding the execution of the contract, and are not binding obligations unless referred to in the operative provisions of the contract." *Mozdzierz v. Accenture, LLP*, Civil Action No. 06-3877, 2010 WL 4273323 at *6, 2010 U.S. Dist. LEXIS 115527 at *19 (E.D. Pa. 2010) (citing 17A C.J.S. Contracts § 317 (2010)). As such, recitals to a contract will not control the operative clauses of that contract unless the operative clauses are themselves ambiguous. *See Schaffran v. Mt. Vernon-Woodberry Mills, Inc.*, 70 F.2d 963, 965 (3d Cir. 1934) ("We are aware of the general rule that, 'If the recitals (in a contract) are clear and the operative part is ambiguous, the recitals govern the construction. If the recitals are ambiguous, and the operative part is clear, the operative part must prevail." (citation omitted)); *see also Nelson Dairies. Inc. v. Royal*, 6 Pa. D. & C.2d 371, 373 (Pa. Com. Pl. 1956)(observing the general rule that "recitals in a contract will not control the operative clauses thereof unless the latter are ambiguous.... In other words, recitals ... cannot control the clearly expressed stipulations of the parties; and where the recitals are broader than the contract stipulations, the former will not extend the latter." (citation omitted)).

*Id.* at 509.

In *Electra Realty Co. Inc. v. Kaplan Higher Educ. Corp.*, 825 F. App'x 70 (3d Cir. 2020), the Third Circuit Court of Appeals explained:

> A recital provision, though it may provide background information or serve as an interpretative aid, does not control over the operative terms of a contract. *See Neal*

14

> *D. Ivey Co. v. Franklin Assoc.*, 370 Pa. 225, 87 A.2d 236, 239 (1952) (stating that
> "[t]he specific terms in the body of the contract control" over recitals, such as
> whereas clauses); *Wyeth Pharm., Inc. v. Borough of West Chester*, ——— Pa.Cmwlth.
> ———, 126 A.3d 1055, 1062 (2015) ("A background recital may not contradict a
> substantive provision of the contract, but it nevertheless will be looked to in
> construing the contract." (citation and internal quotation marks omitted)); *see also*
> *Grynberg v. F.E.R.C.*, 71 F.3d 413, 416 (D.C. Cir. 1995) ("[I]t is standard contract
> law that a Whereas clause, while sometimes useful as an aid to interpretation,
> cannot create any right beyond those arising from the operative terms of the
> document."

*Id.* at 73.  In *Neal D. Ivey Co. v. Franklin Assoc.*, 370 Pa. 225, 87 A.2d 236, 239 (1952), the

Pennsylvania Supreme Court explained that "specific terms in the body of the contract control"

over statements in a recital.[4]

In *Sprint Nextel Corp. v. Wireless Buybacks Holdings, LLC*, 938 F.3d 113, 127 (4th Cir.

2019), the court observed that recitals are not always set forth at the beginning of the agreement

in "whereas" clauses.  The court explained that the critical distinction that made the clause at

issue a recital was that it "states as a factual matter what the parties' intent *is*, not as a contractual

matter what either party *must do*.") (emphasis in original).

The court must determine whether the "market forces" provision in ¶ 3.5.1 imposes an

operative duty upon Arconic or whether it is background or interpretive information.  The

contractual text provides:  "**The parties acknowledge that upon said third-party**

**commercialization of the Alcoa Technology and Know-How, market forces will dictate the**

---

[4] Novelis criticized Arconic for failing to cite Pennsylvania law about the effects of recitals.  (ECF No. 1136 at 6-7 n.4). Novelis, however, cited only two decisions, neither of which involved Pennsylvania law – a 1982 bankruptcy decision from Michigan and a 1988 decision from Colorado. Those decisions are not helpful.  In *Western Gas Processors, Ltd. v. Enron Gas Processing Co.*, No. 87-1472, 1988 WL 73307 (D. Colo., July 7, 1988), the court explained that recitals "cannot of themselves create obligations different from those created by the other 'operative' terms." *Id.* at *19.  The court concluded that the recital at issue (which did not use the term "acknowledge") "cannot, of itself, create any binding contractual obligations." *Id.*  In *Matter of Mahon Indus. Corp., McTevia v. Pullman, Inc.*, 20 B.R. 836, 840–41 (Bankr. E.D. Mich. 1982), the recital involved an acknowledgement of a discrete, present fact (i.e., that certain cranes are fixtures and subject to a security interest), which is far different than the amorphous, forward-looking acknowledgement about future market forces at issue in this case.

**price charged by said third-party for access to the 951 Chemicals and Alcoa Technology and Know-How.**"

The court will closely examine the language used by these sophisticated parties, who negotiated the 2012 License with assistance from counsel.  The provision addresses both "parties."  It is not a one-way provision by which Arconic owed a duty to Novelis.

The provision uses the verb "acknowledge."  This language is non-operative, i.e., it does not impose an affirmative duty to act or refrain from acting.  It is best understood as a recital of the parties' shared expectation about future prices.  In the "market forces" provision, the parties simply acknowledge (i.e., accept or recognize, *see* https://www.thesaurus.com/browse/acknowledge, last visited May 24, 2023), that market forces will apply.  The "market forces" provision does not require any party to do anything.  *See Sprint Nextel Corp.*, 938 F.3d at 127.

The "market forces" provision is forward-looking.  It anticipates the future execution of a commercialization contract with a third-party chemical supplier, an event which had not yet occurred.  The provision uses the future tense "will dictate."  ¶ 3.5.1.  There is no concrete formula or mechanism to determine what the future prices will be.  To the contrary, the clear message is that the parties understood future prices may fluctuate.

Paragraph 3.5.1 clearly reflects that in the future market forces will dictate the price to be charged to Novelis by the third-party for access to both: (1) "the 951 chemicals"; **and** (2) the "Alcoa Technology and Know-How."  ¶ 3.5.1.  In other words, market forces will dictate Arconic's royalty – i.e., Arconic may benefit from its sole approval status at Ford, but if a competitive product is approved by Ford, Arconic may have to reduce its royalty.  Based upon

16

the precommercial terms in ¶¶ 3.1.2 and 3.4.4, Arconic's royalty is by far the largest component of the ultimate price it charged to Novelis.

The term "market forces" is not defined in the 2012 License.  The Merriam-Webster online dictionary defines the term as "the actions of buyers and sellers that cause the prices of goods and services to change without being controlled by the government: the economic forces of supply and demand."  https://www.merriam-webster.com/dictionary/market%20forces, last visited May 12, 2023.  *See Morello v. Kenco Toyota Lift*, 142 F. Supp. 3d 378, 384 (E.D. Pa. 2015) (observing that "in the commercial context [ ] the seller and buyer are presumably adverse, or have conflicting goals: the seller wants to maximize the return and the buyer wants to lower the cost.").  Under the common understanding of the term, *see Bohler-Uddeholm Am., Inc.*, 247 F.3d at 94-95, Arconic's effort, as a seller, to maximize its A951 royalty **is** a market force.[5]

There is no language in the 2012 License to support Novelis' position that damages should be awarded under the "market forces" provision based upon Chemetall's historic margins on other pretreatment products.  (Novelis CCSMF ¶ 31, ECF No. 1049).  Novelis' proffered interpretation is not tethered to the text of the 2012 License.  *See Bohler-Uddeholm Am., Inc.*, 247 F.3d at 92-93 (evidence must point to some specific term in the contract; a party cannot simply argue that it intended something different).  There is nothing in the 2012 License (or other evidence in the record) to show that: (1) Arconic agreed to be bound by Chemetall's historic margins on other pretreatment products Chemetall sold; (2) Chemetall's historic margins on other products reflected the entirety of the market forces impacting the A951 pretreatment process; (3) Arconic contractually promised to minimize its royalty; (4) Arconic agreed to cap

---

[5] The concept of market forces is also reflected in the 2012 Arconic-Chemetall Agreement § 3.1, i.e., "[i]f a product that is competitive to the Alcoa 951 Pretreatment Process significantly impacts the sale of 951 Chemicals, the Parties agree to review and adjust the [pricing] terms."  In other words, Arconic agreed that it would "not unreasonably refuse" to reduce pricing to respond to the market forces of competition.

the price to be paid by Novelis; or (5) Arconic contractually promised that there would be no price floor in the Arconic-Chemetall agreement.

Novelis did not cite any authority for its proposition that an acknowledgement about market forces creates a contractual duty. In the court's independent research, it located two decisions addressing similar circumstances. In *Barseback Kraft AB v. United States*, 121 F.3d 1475, 1481 (Fed. Cir. 1997), the court rejected an argument (similar to Novelis' argument) that recitals created a binding duty on price. The recitals at issue provided: (1) "DOE intends to serve as a reliable long-term supplier of uranium enrichment services at predictable prices while providing the most competitive prices possible through technological innovation"; and (2) "DOE desires to operate the enrichment complex on a sound business basis without Government subsidy." *Id.* In granting summary judgment in favor of the United States, the court concluded that these clauses did not make the contract ambiguous because "these clauses express only desires, not binding commitments." *Id.* In *Florida Power & Light Co. v. United States*, 49 Fed. Cl. 656, 667 (2001), vacated on other grounds, 307 F.3d 1364 (Fed. Cir. 2002) (involving the same contract), the court observed that the "reliable long-term supplier . . . at predictable prices . . . while providing the most competitive prices possible" whereas clause was added at the behest of the Secretary of Energy to make a clear statement about the intent to be competitive. The court, nevertheless, summarily rejected the argument that this clause "created a contractual obligation to set low prices" and explained that recitals cannot control the express provisions of the contract.[6] *Id.* (citing *Barseback*).

As explained above, the "market forces" provision in ¶ 3.5.1 constitutes a "recital"

---

[6] The operative pricing provision of the contract provided: "The charges to be paid to DOE for enrichment services provided to the Customer hereunder will be determined in accordance with the established DOE pricing policy for such services." *Barseback*, 121 F.3d at 1477-78.

because the parties merely "acknowledge" a circumstance surrounding the contract (i.e., that market forces will govern).  *See Sprint Nextel Corp.*, 938 F.3d at 127 (clause is a recital if it "states as a factual matter what the parties' intent *is*, not as a contractual matter what either party *must do*.").  No operative duty is created by the "market forces" provision.

The parties knew how to draft an operative provision.  The next sentence of ¶ 3.5.1, the "other competitor" provision, is an operative provision.  *See Bohler-Uddeholm Am., Inc.*, 247 F.3d at 94-95 (proffered interpretation cannot contradict common understanding when there is another term the parties could easily have used).  If Novelis desired Arconic to have an enforceable duty with respect to Novelis' price, Novelis could have negotiated for a clear mechanism to enforce that duty in ¶ 3.5.1.  A mere acknowledgement that market forces will dictate prices in the future does not suffice.

Under these circumstances, as a matter of contract interpretation, the court concludes that the "market forces" provision is a recital that does not impose a specific duty on Arconic.

### c.   Construed together

Novelis' contention that the "market forces" and "other competitor" provisions should be treated as wholly "separate and independent restrictions,"  (ECF No. 1107 at 9), is not an accurate reflection of the applicable law.  Those provisions are found in successive sentences in the same paragraph of the 2012 License and should be construed together.  As the court in *Brown* explained:

> Clauses in a contract should not be read as independent agreements thrown together without any consideration of their combined effect. Indeed, the document is best read as a whole, wherein clauses seemingly in conflict are construed, if possible, as consistent with one another.

*Brown*, 707 A.2d at 233 (quoting *Flatley by Flatley v. Penman*, 632 A.2d 1342, 1344 (Pa.

Super. Ct. 1993)).  *See Thompson v. Ross*, No. 2:10-CV-479, 2010 WL 3896533, at *4 (W.D. Pa. Sept. 30, 2010) (interpretive maxim *noscitur a sociis* suggests different clauses of the same sentence should be presumed to embrace the subject matter of the sentence).  The same maxim (literally, "it is known from its associates," *see* Black's Law Dictionary 1060 (6th ed. 1990), clearly applies to two adjacent sentences in the same contractual provision, i.e., the document is best read as a whole.[7]  *McClendon v. Sch. Dist. of Philadelphia*, No. CV 23-138, 2023 WL 4237080, at *7 (E.D. Pa. June 28, 2023)  (citing *Commonwealth ex rel. Kane v. UPMC*, 129 A.3d 441, 463-64 (Pa. 2015), for the principle that the entire contract should be read as a whole "to give effect to its true purpose"); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Seagate Tech., Inc.*, No. C 04-01593, 2005 WL 756599, at *6 (N.D. Cal. Apr. 4, 2005) (maxim *noscitur a sociis* applies to meaning of sentences of contracts) (citations omitted).  Courts rely on *noscitur a sociis* in contract interpretation "to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words." *Shoals v. Owens & Minor Distribution, Inc.*, No. 2:18-CV-2355, 2018 WL 5761764, at *10 (E.D. Cal. Oct. 31, 2018) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)).

Here, the "market forces" provision gives context to Arconic's duty in the "other competitor" provision, i.e., prices may fluctuate in the future, but Novelis cannot be treated worse than other A951 customers.  In any event, as discussed above, even consideration of the "market forces" provision in isolation would not save Novelis' argument.

---

[7] For the same reasons, the "price floor" in § 3.1 of the 2012 Arconic-Chemetall Agreement must be read in conjunction with Arconic's duty to not unreasonably refuse to consent to price reductions, which occurs in the next sentence in § 3.1.

2.  The "other competitor" provision

The "other competitor" provision states as follows:  **Alcoa will make commercially reasonable efforts to ensure that Novelis is not disadvantaged relative to any other competitor in any agreement between Alcoa and such third-party commercializing the Alcoa Technology and Know-How."**

a.  Novelis' argument

With respect to the "other competitor" provision, Novelis' theory is premised on the existence of a price differential between Arconic and Novelis.  In Counterclaim III, Novelis points to the fact that Arconic receives a rebate from Chemetall in lieu of a Technology Access Fee.  *See* ECF No. 721 ¶ 324 ("contrary to the promise in the License, Arconic is receiving a rebate of [a percentage] of the 'Target Price' charged by Chemetall, and Arconic and later Arconic Corp. receive vastly favorable pricing on A951 chemical composition from Chemetall. As a result, Novelis has been disadvantaged relative to Arconic in that Novelis had to pay higher prices and incur larger costs for using commercialized '[Arconic] Technology and Know-How' than Arconic.").[8]

b.  The only reasonable interpretation

The parties present classic textual ambiguity arguments about whether Arconic breached the "other competitor" provision.  Novelis reads the phrase "any other competitor" to mean "any competitor other than Novelis" (including Arconic) (ECF No. 1107 at 14).  In other words, according to Novelis, Arconic agreed to make commercially reasonably efforts to ensure that

---

[8] Novelis "respectfully disagrees" with the court's interpretation of the term "any other competitor" to exclude Arconic (as summarized on the record on February 7, 2023, ECF No. 1101, and in the show cause order, ECF No. 1087) and made a short argument in support of its position.  (ECF No. 1107 at 14).  Novelis' primary argument (rejected by the court above), however, is that the "market forces" provision is a separate contractual obligation that Arconic breached, regardless the interpretation of the "other competitor" provision.  *Id.* at 2.

Novelis paid the same amount for the A951 chemical composition as Arconic paid.  Arconic reads the phrase to mean "any competitor other than Arconic."  The court explained on the record at the oral argument on February 7, 2023 that Arconic's interpretation appears to be correct; i.e., is the only reasonable interpretation.  Tr. at 5-6.  After considering the parties' additional arguments, the court adheres to that position.

The word "Alcoa" is used three times in the sentence.  When the parties intended to refer to Alcoa, they did so specifically.  The sentence does not say that Novelis will not be disadvantaged "relative to Alcoa"; instead, it states that Alcoa will ensure that Novelis will not be disadvantaged "relative to any other competitor" in any agreement commercializing Alcoa's technology.

Arconic is not an "other competitor."  Arconic invented the A951 technology and is entitled to earn royalties for its invention.  The precommercial terms and the "market forces" provision reflect that Novelis' price would include a royalty to Arconic.  Novelis knew that it would be disadvantaged on price compared to Arconic by the extent of that royalty (which, as discussed above, was the largest component of Novelis' total precommercialization price for the A951 pretreatment process).  Novelis' position is that it should not be disadvantaged relative to "any competitor."  This position renders the word "other" mere surplusage.  Novelis' argument that the "other competitor" provision requires it to pay the same price as Arconic for the A951 chemical composition and Know-How (despite Arconic's royalty) is not reasonable.

Novelis also attempts to manufacture ambiguity because the provision does not say "other **third-party** competitor," despite several other references to "third-party" in the 2012 License.  The words "third-party" or "third party" arise in six paragraphs of the 2012 License,

i.e., ¶¶ 3.4.4, 3.5.1, 4.2, 6.1, 7.2 and 7.3.[9]  None of those references create any ambiguity about Arconic maintaining a price advantage over Novelis from the third-party chemical manufacturer due to Arconic not having to pay a royalty to the chemical manufacturer for the use by Arconic of its own technology.  In ¶ 3.5.1 (the provision primarily at issue), the term "third-party" is used four times; in each instance, it is clear from the context that the term refers to the chemical manufacturer who will commercialize the A951 technology.  There was no need to use the term "third-party" to modify the reference to "other competitor" in ¶ 3.5.1.

As a matter of law, the "other competitor" provision is not ambiguous.  Arconic has a duty to make reasonable efforts to ensure that Novelis is not disadvantaged relative to any competitor other than Arconic in its agreement with Chemetall.  Novelis' proposed interpretation leads to an unreasonable result that cannot be reconciled with the other terms of the 2012 License.  Because the operative "other competitor" provision is not ambiguous, there is no need to consult the "market forces" recital to understand it.

Novelis' alleged breach of contract is based only on a price disadvantage relative to Arconic.  There is no evidence that any Chemetall customer (other than Arconic) received a more favorable price than Novelis.

In sum, as a matter of law, Arconic did not breach its duty under the "other competitor" provision.

E.  Extrinsic evidence

---

[9] Paragraph 3.4.4 refers to the third-party chemical manufacturer.  Paragraph 4.2 refers to any third party who may have a right to disclose confidential information.  Paragraph 6.1 provides a representation and warranty that entry into the 2012 License does not require consent from a third party.  Paragraphs 7.2 and 7.3 provide that Alcoa will indemnify Novelis from claims by a third party that the Alcoa technology infringes the intellectual property rights of that third party.  None of the third-party references relate to a competitor.

Where the intention of the parties is clear from the contractual language, there is no need to consult extrinsic evidence. *Bohler-Uddeholm Am., Inc.*, 247 F.3d at 92-93; *accord Orion Drilling Co., LLC v. EQT Prod. Co.*, 826 F. App'x 204, 212 (3d Cir. 2020) (extrinsic evidence may only be considered to determine intent when there is an ambiguity) (citing *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001)).  The Third Circuit Court of Appeals observed in *Orion* that "[a]bsent fraud or unconscionability, courts should not set aside terms on which sophisticated parties agreed." *Id.* (quoting *John B. Conomos, Inc. v. Sun Co. (R&M)*, 831 A.2d 696, 708 (Pa. Super. Ct. 2003)).

Even if the court were to consider extrinsic evidence, the record reinforces the court's interpretation of ¶ 3.5.1.  Novelis' negotiator for the 2012 License (Soultz) tried to negotiate a post-commercialization price cap in the agreement, similar to the cap for the pre-commercialization pricing.  Novelis failed to obtain that language because Arconic refused.  Soultz Deposition at 161-163.

The structure of the 2012 License reflects that it is primarily a technology license, not a supply contract.  Paragraph 3.5.1 is a short provision in comparison to the detailed precommercialization pricing terms in ¶ 3.1.  The inclusion of a limitation of liability clause in ¶ 6.3 of the 2012 License undermines Novelis' argument that ¶ 3.5.1 imposed a specific obligation on Arconic with respect to Novelis' price.  *See Neal D. Ivey*, 87 A.2d at 239 ("It is a rule of universal application that in construing a contract each and every part of it must be taken into consideration and given effect if possible, and that the intention of the parties must be ascertained from the entire instrument.").[10]

---

[10] The court does not reach Arconic's summary judgment argument that the limitation on liability clause in ¶ 6.3 of the 2012 License is enforceable, which requires a prediction of Pennsylvania law about the applicable standard to invalidate a limit on liability clause.  *Compare Polymer Dynamics, Inc. v. Bayer Corp.*,

There was no real "market" for the A951 pretreatment process at the time the 2012 License was executed.  Ford had made the decision to make an aluminum intensive F-150 pickup truck, but it was a new venture with an unknown outcome. Ford minimized Arconic's monopoly power by requiring Arconic, if it wanted to supply Ford, to deal with Novelis and Chemetall. *See* Tr. at 5 (observing that the idea of a "magical market" that exists independent of Arconic enabling Chemetall to sell A951 is "far-fetched"). The P552 program was expected to last for ten years.  Because the 2012 License was executed prior to commercialization, market conditions over the life of the P552 Program for the next ten years were difficult to quantify and the third-party chemical supplier was not yet in place.  It is not surprising that binding post-commercialization price terms were not included in the 2012 License.

In sum, the extrinsic evidence reinforces the court's conclusion that in ¶ 3.5.1, the parties recognized (i.e., acknowledged) that prices may fluctuate throughout the length of the program based on market forces arising from competition to the A951 pretreatment process, but agreed that Novelis would not be disadvantaged on price relative to any competitor other than Arconic.

In any event, the record discloses that Novelis did not pay the "price floor."  Instead, Chemetall proposed a significant price break for Novelis in recognition of Novelis' role as a development partner in the commercialization process.  (Fudge Deposition at 471-472.) Chemetall sought approval for the reduced price to Novelis and Arconic granted it.  *Id.*  Novelis' price remained at that discount through the present.

---

No. CIV. A. 99-4040, 2000 WL 1146622 (E.D. Pa. Aug. 14, 2000) (bad faith standard), *with John B. Conomos, Inc. v. Sun Co. (R&M)*, 831 A.2d 696 (Pa. Super. Ct. 2003) (unconscionability standard).

V. Conclusion

For the reasons set forth above:  (1) partial summary judgment will be granted in part in favor of Arconic and against Novelis on counterclaim II in that Novelis can recover only nominal damages; and (2) summary judgment will be granted in part in favor of Arconic and against Novelis on counterclaim III.

An appropriate order follows.

Dated: July 13, 2023                           By the Court:

                                               /s/ Joy Flowers Conti
                                               Joy Flowers Conti
                                               Senior United States District Judge