**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ARCONIC CORPORATION AND HOWMET AEROSPACE INC.**, | ) CIVIL ACTION NO.  17-1434 |
| | ) |
| | ) JUDGE JOY FLOWERS CONTI |
| Plaintiffs and Counterclaim Defendants, | ) |
| | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| **NOVELIS INC.** *and* **NOVELIS CORP**, | ) |
| | ) |
| Defendants and Counterclaim Plaintiffs. | ) |

**MEMORANDUM OPINION re SUMMARY JUDGMENT and R&R #46**

I.      Introduction

This hard-fought litigation between business competitors Arconic Corporation and

Howmet Aerospace, Inc. (collectively, "Arconic") and Novelis Inc. and Novelis Corporation

(collectively, "Novelis") has spanned 7 years and resulted in 1152 entries on the docket (and

counting).  Cross-motions for summary judgment are pending (ECF Nos. 988, 1003).  The court

held oral argument on February 7, 2023.  (Transcript, ECF No. 1101, under seal).

Certain aspects of the summary judgment motions were referred to the special master for

report and recommendation ("R&R") (ECF No. 1065).  Specifically, the court referred to the

special master the summary judgment motions with respect to counts 2 and 4 of Arconic's

complaint that Novelis disclosed its confidential information (the "7 CI"), and Novelis' Sherman

Act and Robinson Patman Act ("RPA") counterclaims (Counterclaims XI and XII) (ECF No.

1065).  The special master addressed these issues in R&R #46 (ECF No. 1139, under seal).

Arconic filed objections to the special master's R&R #46 (ECF No. 1146).  Novelis did not

object to R&R #46, but filed a response to Arconic's objections (ECF No. 1150).

The court issued several opinions and orders with respect to other summary judgment disputes. *See* ECF Nos. 969, 970 (Arconic's breach of contract damages); 1087, 1088 (RPA damages)[1]; 1118, 1119 (declaratory judgment claims and counterclaims); and 1151, 1152 (Novelis Counterclaims II and III). This opinion and the accompanying order address the remaining issues raised in the summary judgment motions and Arconic's objections to the special master's R&R #46 (ECF No. 1146) with respect to the 7 CI claims and the RPA counterclaim. Upon review of R&R #46 and the parties' summary judgment filings, the court concludes that it needs additional briefing about a threshold legal issue with respect to Novelis' Sherman Act § 1 counterclaim.

Although many of the related filings are sealed, this opinion will not be filed under seal.

## II.     Standard of review

In *Wilczek v. Phillips 66 Co.*, No. CV 19-17374, 2023 WL 3644652 (D.N.J. May 25, 2023), the court recently reviewed the general summary judgment standard:

> Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)).
>
> The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the

---

[1] In an opinion and order dated March 8, 2023 (ECF Nos. 1087, 1088), the court granted Arconic's motion for summary judgment (ECF No. 1003) in part, and denied Novelis' motion for summary judgment (ECF No. 988) in part, in that Novelis cannot recover treble damages for the alleged RPA violation in Counterclaim XII. Novelis' ability to obtain injunctive relief on the RPA counterclaim was addressed in R&R #46 by the special master and will be addressed in this opinion.

burden on the moving party may be discharged by 'showing' — that is, pointing
out to the district court — that there is an absence of evidence to support the
nonmoving party's case." *Id.* at 325. Once the moving party has met that threshold
burden, the non-moving party "must do more than simply show that there is some
metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith
Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual
evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477
U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which
nonmoving party must rely to support its assertion that genuine issues of material
fact exist).

Unsupported allegations, subjective beliefs, or argument alone cannot forestall
summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1988)
(nonmoving party may not successfully oppose summary judgment motion by
simply replacing "conclusory allegations of the complaint or answer with
conclusory allegations of an affidavit."); *see also Brewer v. Quaker State Oil Ref.
Corp.*, 72 F.3d 326, 330 (3d Cir. 1995) ("[T]he nonmoving party creates a genuine
issue of material fact if it provides sufficient evidence to allow a reasonable jury to
find for him at trial."). Thus, if the nonmoving party fails "to make a showing
sufficient to establish the existence of an element essential to that party's case, and
on which that party will bear the burden of proof at trial ... there can be 'no genuine
issue of material fact,' since a complete failure of proof concerning an essential
element of the nonmoving party's case necessarily renders all other facts
immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55, n.5 (3d Cir. 1992)
(quoting *Celotex*, 477 U.S. at 322-23).

*Id.* at *2-3.

The special master appointment order (ECF No. 50) provides that the special master's

recommendations will be reviewed by the court de novo. *Id.* ¶ 16. The order also provides that

"failure to file a timely objection shall constitute a waiver of any objection." *Id.* ¶ 14. The court,

accordingly, will review de novo the portions of R&R #46 to which Arconic objected.


III.    Counts 2 and 4 relative to Arconic's 7 CI claims

Novelis seeks summary judgment on the claims relating to the 7 CI identified by the

special master. Arconic's 7 CI claims sound in breach of contract. Arconic alleges that Novelis

disclosed Arconic's confidential information in a 2016 patent application (the "2016 patent

application"), contrary to the terms of: (count 2) a Technology Access & License Agreement

dated August 15, 2012 (the "2012 License") (ECF No. 1-3); and (count 4) a Confidentiality, Nondisclosure and Limited Use Agreement dated November 1, 2011, as amended March 2, 2012 (the "23 Coil NDA") (ECF No. 1-2). The same agreements were attached to Arconic's operative second amended complaint. (ECF Nos. 177-1, 177-2). In resolving the *Daubert* motions, the court determined that "Arconic is entitled to recover only nominal damages if it proves a breach of contract claim against Novelis for disclosure of the 7 CI." ECF No. 969 at 18. The court will first address the issues about the 23 Coil NDA and second will address the issues about the merits of the claims.

### A.  23 Coil NDA – Count 4

Novelis contends that the 23 Coil NDA was not breached because that contract was limited to Novelis' evaluation of 23 sample coils. Novelis argues, in the alternative, that the 23 Coil NDA was superseded by the 2012 License. Arconic argues that the 23 Coil NDA was not superseded and imposed a broad duty to protect information shared "in connection with an evaluation of Alcoa's 951 coating process." (ECF No. 1146 at 20; ECF No. 1-2).

The special master concluded that: (1) the 23 Coil NDA, not another nondisclosure agreement dated November 1, 2011 (the "A951 Process NDA"), is the contract at issue; (2) the 23 Coil NDA is limited in scope, based primarily on the definition of the parties' relationship in the first Whereas clause; and (3) in the alternative, the 23 Coil NDA was superseded by the 2012 License. R&R #46 at 42-50. The court will review each of these conclusions de novo.

### 1.  Basis for claim

The court agrees with the special master that the 23 Coil NDA is the applicable contract to consider, not the A951 Process NDA. Arconic is the master of its complaint. *Dennis v. City*

*of Phila.*, 19 F.4th 279, 291 (3d Cir. 2021) ("plaintiff, as the master of the complaint, is free to choose between legal theories").  Arconic has maintained throughout this litigation that its breach of contract claim is based upon the 23 Coil NDA.  The court also agrees with the special master that Arconic will not be permitted to amend its Complaint now, seven years later, to assert a different contract.  (R&R #46 at 50 n.9).

>2.  The operative provisions in the 23 Coil NDA

The court does not agree with the special master's recommendation about the scope of the 23 Coil NDA.  The special master relied heavily on the parties' definition of "the Relationship" covered by the 23 Coil NDA in determining it is limited to the 23 coil samples.  R&R #46 at 45-47 (concluding the covenant was to protect the confidentiality of the information during the testing of the sample coils).

As recently discussed in the court's opinion about Counterclaim III, recitals cannot overcome the effect of the operative provisions of a contract.  (ECF No. 1151).  The court incorporates the principles of contract interpretation as set forth in that opinion.  (ECF No. 1151 at 11-13).

The first Whereas clause of the 23 Coil NDA provides, in its entirety (emphasis added):

> WHEREAS, Alcoa and Novelis each wish to investigate, analyze and possibly enter into various relationships or transactions between them, including but not limited to, cooperating in connection with an evaluation of Alcoa's 951 coating process **for purposes of supplying 23 coil samples** coated therewith to a third party (**"the Relationship"**);

ECF No. 1-2.

The contract has other applicable provisions.  The parties defined the Purpose of the agreement in § 1(c) of the 23 Coil NDA, as follows (emphasis added):

> "Purpose" shall mean **discussions and information shared** between the Parties **relating to** Alcoa's 951 coating process **as provided on** approximately 23 sample

5

coils of Novelis aluminum sheet supplied by Novelis to Alcoa for provision to a third-party customer.

ECF No. 1-2.

On March 2, 2012, the parties entered into an amendment to the 23 Coil NDA (the "March 2012 Amendment"). The Purpose was redefined (and broadened) in the March 2012 Amendment, as follows:

> "Purpose" shall mean discussions and information shared between the Parties relating to Alcoa's 951 coating process as provided on approximately 23 sample coils of Novelis aluminum sheet supplied by Novelis to Alcoa for provision to a third-party customer **and the supply by Alcoa of 951 coating process chemicals to Novelis for use in support of the Ford P552 Program**.

*Id.* (emphasis added). Contrary to the special master's statement that the 23 Coil NDA did not contemplate that Novelis would apply the A951 chemicals to aluminum samples, R&R #46 at 46 ("This NDA does not contemplate that Novelis will do any action to apply A951 to the aluminum samples"), the March 2012 Amendment specifically stated that Arconic would supply 1000 gallons of the A951 coating process chemicals to Novelis. March 2012 Amendment to § 4(e) (ECF No. 1-2).

"Confidential information" was defined broadly in the 23 Coil NDA to include information "disclosed, provided or revealed pursuant to this Agreement." ECF No. 1-2 § 1(a). In § 2(b), the parties agreed that "Confidential Information **will be received and maintained** by the Receiving Party in confidence and except as set forth herein, **not disclosed** to third parties . . . ." ECF No. 1-2 (emphasis added). In other words, the parties had a duty to maintain confidential information (defined broadly) in confidence and not disclose it to third parties.

Thus, the operative provision and the March 2012 Amendment to the "Purpose" are broader than the definition of "the Relationship" in the recital. The 23 Coil NDA creates a duty of confidentiality for "discussions and information shared . . . as provided on" the 23 sample

coils.  ECF No. 1-2. The operative duty of confidentiality relates to the "**information shared**," not just the 23 sample coils.  Indeed, the March 2012 Amendment reflects that Arconic was providing 1000 gallons of A951 chemicals to Novelis.  If the 7 CI were "disclosed, provided or revealed" pursuant to the 23 Coil NDA[2] (and did not fall within a contractual exclusion, *see, e.g.*, 23 Coil NDA § 3), then Novelis may have had a duty to not disclose the 7 CI.  In sum, the court cannot determine as a matter of law that Novelis' alleged disclosure of the 7 CI did not breach the 23 Coil NDA.

> 3.  Effect of the 2012 License on the 23 Coil NDA

The court must address Novelis' alternative argument that the 23 Coil NDA was superseded by the 2012 License.  Arconic argues that the 2012 License (signed by Novelis Inc., a Canadian corporation) cannot supersede the 23 Coil NDA (signed by Novelis Corp., a Texas corporation).

The 23 Coil NDA contains an integration clause, § 8(e), and provides that it cannot be modified "except by an instrument in writing, signed by both Parties."  ECF No. 1-2 § 8(f).  The term "Parties" is defined in the 23 Coil NDA preamble to be Arconic and "Novelis Corporation, a Texas corporation."  ECF No. 1-2.

The 2012 License also contains an integration clause, §9.7, and provides that no modification shall be binding "unless made in writing and signed by the Parties."  ECF No. 1-3.  The term "Parties" is defined in the 2012 License preamble to be Arconic and "Novelis Inc., a Canadian corporation."  ECF No. 1-3.

Thus, the "Parties" are defined differently in the 23 Coil NDA and the 2012 License.  There is no evidence in the record that Novelis Inc. became a "party" to the 23 Coil NDA.  The

---

[2] Neither party addressed this issue in the summary judgment briefing.  It will be Arconic's burden to demonstrate when and how it disclosed each of the 7 CI.

March 2012 Amendment to the 23 Coil NDA was signed by Arconic and Novelis Corporation. (ECF No. 1-2).  There is no evidence in the record of any other modification to the 23 Coil NDA.

Novelis and the special master point to extrinsic evidence about the parties' intent to "clean up" the NDAs and supersede them with the 2012 License. (*See* R&R #46 at 49-50). Evidence about the parties' "course of performance is relevant to show a waiver or modification of any term inconsistent with the course of performance." *Moore Eye Care, P.C. v. ChartCare Sols. Inc.*, 364 F. Supp. 3d 426, 432 (E.D. Pa. 2019).  Such evidence, however, does not support entry of summary judgment in favor of Novelis, given the contractual language favoring Arconic's position.  Novelis must prove the modification by "clear, precise, and convincing evidence." *Id.*  In sum, the course of performance evidence creates a fact dispute that precludes the entry of summary judgment in favor of either party.  *Id.*

The 23 Coil NDA (unlike the 2012 License) does not contain a waiver of jury trial provision.  Thus, the issues whether: (1) the 23 Coil NDA was superseded by the 2012 License; and (2) the alleged disclosures of the 7 CI were made in connection with the 23 Coil NDA, do not fall within a contractual exclusion, and are attributable to Novelis Corporation must be decided by a jury.[3]

B.  Merits of the 7 CI claims

The court summarized the background to this dispute in its opinion dated November 18, 2022:

> The 2012 License provided, among other things, that Novelis could use processes that were part of general industry practices, retained its own technology and know-how, and owned improvements it developed independent of Arconic. License §§ 2.2.1, 2.2.2, 2.2.3.  Arconic's disclosures to Novelis took place in the

---

[3] If the jury finds the 2012 License superseded the 23 Coil NDA, then the court will need to determine whether Novelis Inc. breached the 2012 License.

context of three patents related to the A951 process, which by reason of the public nature of patents involved disclosures in the public domain.

The breach alleged by Arconic occurred in a one-time event six years ago. On November 3, 2016, Novelis filed patent application No. 0319440 (the "'440 patent") with respect to improvements it made to the A951 process. Arconic filed this lawsuit in 2017, alleging that Novelis disclosed Arconic's trade secrets and confidential information in the '440 patent application. No threat of ongoing or future misconduct by Novelis was raised by the pending claims. Arconic's claims are not based on the chemical formulation ("A951") used in the A951 process – the specific chemical formulation was never disclosed to Novelis. (ECF No. 269, Ex. K at 16, filed under seal).

Because the alleged disclosures in the '440 patent application involved already-public information from Arconic's prior patents and Novelis' own improvements, the court explained (repeatedly) that before allowing Arconic to undertake extensive discovery into its competitor's technology, it was incumbent upon Arconic to first articulate, with specificity, what it contends are its own trade secrets and confidential information, as opposed to general industry practices or Novelis' authorized improvements to the A951 process. As this court has recounted at length, Arconic never made an adequate disclosure. Ultimately, the court granted summary judgment in favor of Novelis on the entirety of Arconic's trade secret claims and on the vast majority (281 of 288) of Arconic's confidential information claims. The confidential information claims in counts II and IV were permitted to proceed only on the narrow basis identified by the special master in R&R #33 (i.e., with respect to the 7 CI) (ECF Nos. 622, 623).

(ECF No. 969 at 3-4). The court explained that to prove a breach, Arconic must demonstrate five things about the 7 CI. They were: (1) Arconic's information; (2) confidential; (3) disclosed in a way that Novelis had notice to keep them confidential; (4) not previously known to Novelis or the industry; and (5) disclosed by Novelis in the 2016 patent application. *Id.* at 15 n.7.

In resolving the *Daubert* motion about Arconic's technical expert relating to the 7 CI, the court held:

Ernst [Arconic's expert] will not be permitted to offer opinions that are contrary to the court's summary judgment ruling (ECF #623 at 37-40). It is law of the case that Arconic cannot recover for any CI, except for the 7 specific items identified by the special master. Arconic will not be permitted to invite the jury to consider: (1) the process as a whole; (2) the "fundamental meaning" about the underlying physics; or (3) that numbers outside the ranges set forth in the 7 CI can still be confidential. Ernst can opine only on the ranges set forth in the 7 CI and cannot

invite the jury to decide the claim on any other basis.

*Id.* at 20.

The court agrees with the special master that Novelis is entitled to summary judgment in its favor on the claims relating to CI-1, CI-2 and CI-7. With respect to CI-1 and CI-7, the ranges in that information are not similar to the ranges disclosed in Novelis' patent application. With respect to CI-2, there is no overlap at all. The court adopts the special master's explanation. (R&R #46 at 55-57, 60-61). Novelis did not object to the special master's recommendations that summary judgment be denied on the claims relating to CI-3, CI-4. CI-5 and CI-6, and therefore, the court will not address those issues. Novelis' motion for summary judgment on counts 2 and 4 will be granted in part and denied in part.

In summary, two aspects of the 7 CI claims survive summary judgment: (1) whether the 23 Coil NDA was superseded by the 2012 License; and (2) the merits of Arconic's claims with respect to CI-3, CI-4, CI-5 and CI-6 under the 2012 License and (if not superseded) the 23 Coil NDA. A jury must resolve both questions with respect to count 4 (Arconic's claim for breach of the 23 Coil NDA) and the court will seek an advisory opinion from the jury with respect to the merits of Arconic's claims with respect to CI-3, CI-4, CI-5 and CI-6 in count 2 (Arconic's claim for breach of the 2012 License). To repeat, Arconic can recover only nominal damages if it succeeds on either count.

IV.     Robinson-Patman Act (Counterclaim XII)

The key dispute about the RPA counterclaim is whether that statute applies in the circumstances of this case. The parties agree on the elements of the RPA claim, which the court summarized as follows:

Section 13(f) of the Robinson-Patman Act provides: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section." 15 U.S.C. § 13(f). To state a claim, a party must allege facts to demonstrate that (1) the defendant made at least two contemporary sales of the same commodity at different prices to two different purchasers; and (2) the effect of such discrimination was to injure competition. *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 228 (3d Cir. 2008) (citing *Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc.*, 159 F.3d 129, 142 (3d Cir. 1998)). The plaintiff must show that the price differential exceeded any cost savings the seller may have enjoyed in sales to the favored buyer. *Marjam Supply Co. v. Firestone Bldg. Prod. Co., LLC*, No. 11-CV-7119, 2014 WL 5798383, at *4 (D.N.J. Nov. 7, 2014). Injury to competition may be shown by proof of lost sales or profits, or by "proof of a substantial price discrimination between competitors over time." *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1272 (3d Cir. 1995).

(ECF No. 252).  In denying Arconic's argument that the RPA claim was futile, the court concluded that Novelis' RPA claim "raised fact issues not appropriate for the pleading stage." (ECF No. 252).  After discovery, the parties filed cross-motions for summary judgment on the RPA claim.  The court previously determined that Novelis cannot obtain monetary damages on its RPA claim.  (ECF No. 1087).

In R&R #46, the special master recommended that summary judgment be denied on: (1) whether Arconic and Novelis were competing purchasers; and (2) whether A951A, A951B and A951C were of "like grade and quality."  The special master recommended that, although the court must decide whether injunctive relief is appropriate, those issues be presented to the jury for an advisory verdict.  (ECF No. 1139 at 34 n.6).

In its objections to R&R #46, Arconic reiterates its contention that it is entitled to summary judgment on the RPA counterclaim.  The special master recognized that both parties believe that the "competing purchasers" issue should be resolved as a matter of law based on the undisputed facts about their contractual arrangements.  (ECF No. 1139 at 32).  The special master, however, concluded that the factual record is not sufficiently developed with respect to

the timing of competition and nature of the market vis-a-vis Ford's purchasing decisions.  *Id.* at 33.

 The Third Circuit Court of Appeals has not provided entirely consistent guidance about the scope of the RPA. The court acknowledges there are precedents describing the RPA as a "prophylactic statute" that does not require a plaintiff to show that the alleged discrimination in fact harmed competition. *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1271 (3d Cir. 1995) (citing *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 561 (1981)); *Feesers, Inc. v. Michael Foods, Inc.*, 498 F.3d 206, 213 (3d Cir. 2007) ("*Feesers I*"); *accord Automann, Inc. v. Dayco Prod.*, LLC, No. CV2014541, 2021 WL 3269707, at *2 (D.N.J. July 30, 2021).

 In 2006, the Supreme Court denied an RPA claim in *Volvo Trucks North America, Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 175 (2006).  The Supreme Court explained that the RPA "centrally addresses price discrimination in cases involving competition between different purchasers for resale of the purchased product."  *Id.* at 169–70.  The Court rejected an RPA claim "when a product subject to special order is sold through a customer-specific competitive bidding process" because it did not involve "[c]ompetition of that character."  *Id.* at 170.  The Court explained "Congress sought to target the perceived harm to competition occasioned by powerful buyers, rather than sellers; specifically, Congress responded to the advent of large chainstores, enterprises with the clout to obtain lower prices for goods than smaller buyers could demand."  *Id.* at 175.  In sum, the RPA "signals no large departure" from the "primary concern of antitrust law," which is to protect <u>interbrand</u> competition.  *Id.* at 180-81 (emphasis added).[4]

---

[4] In the context of this case, both Arconic and Novelis were selling A951 pretreated aluminum to Ford (i.e., the same product, which required the use of Arconic's intellectual property).  That kind of competition appears to be akin to intrabrand competition.

The Court commented that it would resist an "interpretation geared more to the protection of existing *competitors* than to the stimulation of *competition*." *Id.* at 181 (emphasis in original).

Since the decision in *Volvo Trucks*, the Third Circuit Court of Appeals has recognized the limited scope of the RPA.  In *Toledo Mack Sales & Services, Inc. v. Mack Trucks, Inc.*, 530 F.3d 204 (3d Cir. 2008), the court relied heavily on the analysis in *Volvo* in concluding that the RPA should be narrowly construed.  *Id.* at 228.  The court commented it is "no injustice to narrowly interpret the oft-questioned RPA."  *Id.* (noting the recommendation by the Antitrust Modernization Commission that the RPA be repealed in its entirety).

In *Feesers, Inc. v. Michael Foods, Inc.*, 591 F.3d 191 (3d Cir. 2010) ("*Feesers II*"), the Third Circuit Court of Appeals reiterated that "[t]his Court has dutifully followed the Supreme Court's lead by narrowly construing the RPA."  *Id.* at 198–99.  The court specifically rejected the kind of creative use of the RPA advocated by Novelis in this case:

> The Supreme Court also signaled that it was uninterested in permitting innovative applications of the RPA and would resist "interpretation[s] geared more to the protection of existing *competitors* than to the stimulation of *competition*." [*Volvo Trucks*, 546 U.S. at 181] (emphasis in original). It also noted that the custom truck market bore "little resemblance to [the] large independent department stores or chain operations" that the RPA originally intended to target. *Id.*  This Court used similar reasoning in *Toledo Mack.* 530 F.3d at 226–29.

*Feesers II,* 591 F.3d at 200–01.

The court explained in *Feesers II* that "the timing of competition and the nature of the market are critical factors to consider when determining whether the plaintiff can show that it was a competing purchaser of a favored purchaser."  *Id.* at 201 (noting that in *Toledo Mack*, because the competition occurred during the bidding process, and not at the time of the actual sale, the competing purchaser requirement was not met).  *Id.*  The court determined "two parties are in competition **only** where, after a careful analysis of each party's customers, we determine

that the parties are each directly after the same dollar." *Id.* at 203 (cleaned up, emphasis added). In *Feesers II*, the court reiterated the general principle from *Volvo Trucks* and *Toledo Mack* that "the alleged price discrimination d[id] not implicate the original purpose of the RPA because 'the allegedly favored purchasers [we]re dealers with little resemblance to large independent department stores or chain operations.'" *Id.* at 201.

Novelis relies heavily on the decision in *Feesers I*, in which the court reversed a grant of summary judgment on an RPA claim. Novelis argues that the holding in *Feesers II* is "explicitly limited" to bid markets that closely resemble that case and points out that the decision in *Feesers II* came after trial. (ECF No. 1150 at14 & n.9). There are two problems with Novelis' position. First, although the decision in *Feesers II* came after a bench trial, the Third Circuit Court of Appeals vacated the verdict in favor of the plaintiff and directed judgment in favor of the defendant because the "competing purchasers" requirement was not met as a matter of law. *Feesers II*, 591 F.3d at 193. Second, the majority opinion in *Feesers I* did not address the impact of the Supreme Court's decision in *Volvo Trucks* on the scope of the RPA; the *Volvo Trucks* decision was discussed only in the dissent. *See Feesers I* at 220 (Jordan, J., dissenting) (Supreme Court explained in *Volvo Trucks* that RPA did not apply because there was "no discrete 'favored' dealer comparable to a chain store or a large independent department store.").[5]

None of the decisions relied upon by Novelis address the impact of the Supreme Court's decision in *Volvo Trucks*. The court in *Feesers II* did so, and emphasized that the underlying principles in *Volvo Trucks* and *Toledo Mack* should be expansively applied, and the RPA itself should be narrowly applied:

> there is no reason to limit the reach of the *Toledo Mack* decision to customized
> goods because the underlying principles, pertaining to the timing of the competition
> and the nature of the market, remain the same whether applied to generic goods or

---

[5] Judge Jordan authored the unanimous decision in *Toledo Mack*.

customized goods. This Court's directive to "narrowly interpret the oft-questioned RPA" also supports rejection of the District Court's view. *Toledo Mack,* 530 F.3d at 228 n. 17. A narrow interpretation, one that limits the applicability of the Act, calls for taking an expansive view of *Toledo Mack*'s holding and not limiting it to customized goods. *See Id.*

*Feesers II,* 591 F.3d at 207.   To summarize, the RPA must be narrowly construed:

> [T]he Supreme Court, in its most recent decision addressing the Robinson–Patman Act, urged lower courts to construe the Act narrowly. *Volvo Trucks N. Am., Inc. v. ReederSimco GMC, Inc.*, 546 U.S. 164, 181, 126 S.Ct. 860, 163 L.Ed.2d 663 (2006). The Court cited its much earlier decision in *Automatic Canteen Co. of America v. FTC*, 346 U.S. 61, 63, 73 S.Ct. 1017, 97 L.Ed. 1454 (1953), which it described as "cautioning against Robinson–Patman constructions that extend beyond the prohibitions of the Act and, in doing so, help give rise to a price uniformity and rigidity in open conflict with the purposes of other antitrust legislation." *Id.* at 181. Even Justice Stevens, who dissented in *Volvo*, noted that the Act "may well merit [noted antitrust law scholar] Judge [Robert] Bork's characterization as 'wholly mistaken economic theory.' " 546 U.S. at 187. *See also Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 227 (3d Cir. 2008) (describing the Supreme Court's decision in *Volvo* as narrowly construing the Robinson–Patman Act).

*Drug Mart Pharmacy Corp. v. Am. Home Prod. Corp.*, No. 93-CV-5148 ILG, 2012 WL 3544771, at *8 (E.D.N.Y. Aug. 16, 2012), *aff'd sub nom. Cash & Henderson Drugs, Inc. v. Johnson & Johnson*, 799 F.3d 202 (2d Cir. 2015).   Under *Volvo Trucks, Feesers II,* and *Toledo Mack*, it is clear that the RPA should be limited to situations resembling the original congressional intent for the statute, such as large retail stores or chain operations who obtain discounts not available to smaller independent stores.

The special master recognized that the facts of the present case do not align perfectly with either the "bid market" paradigm, which would not support an RPA claim, or the "retail chain vs. independent store" paradigm, which is the classic RPA scenario.   R&R #46 at 31.   The court agrees with the special master's conclusion that the facts of this case do not fit neatly into either paradigm.   The legal effect of that conclusion, however, mandates that the RPA

counterclaim must fail as a matter of law. The Third Circuit Court of Appeals instructs that the RPA is to be interpreted narrowly -- not expanded to cover the situation here.

The contractual arrangements in this case (large automotive suppliers entering into long-term supply agreements with the same buyer - Ford; one competitor using another competitor's proprietary intellectual property, by way of an exclusive license given to a third-party chemical company, as required by Ford) bear no resemblance to the classic RPA scenario.  Novelis and Arconic were not competing for the same dollar of Ford's business.  To the contrary, Ford needed both of them to supply its needs for the P552 Program and Ford was unwilling to be dependent on a sole supplier.  As a condition of approval, Ford required Arconic to share its A951 technology with Novelis.  Ford entered into long-term supply contracts with both Arconic and Novelis.  Novelis obtained the majority of Ford's business, using Arconic's proprietary trade secret for the A951 chemical composition.  Ford also required Arconic to commercialize its A951 pretreatment process through a third-party chemical supplier (Chemetall).  The price differential in the sales by Chemetall (the exclusive licensee of Arconic's proprietary A951 technology) to Arconic and Novelis was related to Arconic's royalty for its intellectual property, including the A951 chemical composition, i.e., Arconic received a rebate from Chemetall in lieu of its royalty.  Arconic-Chemetall Agreement § 3.1.3.  The court can not extend the RPA statute to apply to the circumstances of this case.  Summary judgment will be entered in favor of Arconic and against Novelis on Counterclaim XII.[6]

V.      Novelis' Counterclaim XI (Sherman Antitrust Act § 1)

A.  Threshold issues identified in *Host*

---

[6] The court does not need to reach the issue whether the sales involved goods of like grade and quality.

In *Host International, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 248 (3d Cir. 2022), the Third Circuit Court of Appeals, in a precedential decision, emphasized the requirement for an antitrust plaintiff to demonstrate antitrust standing, including, as one of its essential elements, antitrust injury.  In *Host*, the court commented that recovery of treble damages under the Sherman and Clayton Acts "is subject to an additional, a-textual requirement known as 'antitrust standing,'" which is "far more limiting" than Article III standing.  *Id.* at 248-49.  The factors to establish antitrust standing are:

(1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing;

(2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress [i.e, the "antitrust injury" requirement];

(3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims;

(4) the existence of more direct victims of the alleged antitrust violations; and

(5) the potential for duplicative recovery or complex apportionment of damages.

*Host*, 32 F.4ᵗʰ at 249 (quoting *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165–66 (3d Cir. 1993) (citing *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 545 (1983) ("*AGC*")).

In *Host*, the court emphasized that "the second [*AGC*] factor, antitrust injury, is a necessary condition of antitrust standing.  If it is lacking, [a court] need not address the remaining *AGC* factors."  *Id.* (cleaned up).  The court, therefore, should consider "antitrust injury" before examining the other *AGC* factors:

The Third Circuit has [ ] "made it abundantly clear ... that a cognizable antitrust injury is a necessary precursor to antitrust standing, regardless of whether other [of the above-mentioned] factors support such a finding." *McCullough v. Zimmer, Inc.*, 382 F. App'x 225, 230 (3d Cir. 2010) (citing *Barton*, 118 F.3d at 184 n.9). "Indeed,

> [the Third Circuit has] directed district courts to consider the threshold issue of antitrust injury at the outset, because '[i]f antitrust injury is not found, further inquiry is unnecessary.' " *Id.* (quoting *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 265 (3d Cir. 1998)).

*In re Direct Purchaser Insulin Pricing Litig.*, No. 320CV3426, 2021 WL 2886216, at *8 (D.N.J. July 9, 2021).  In other words, "antitrust injury" is a threshold question for "antitrust standing," which is a threshold question for liability.  *See Smart Commc'ns Holding, Inc. v. Glob. Tel-Link Corp.*, No. 1:21-CV-01708, 2022 WL 16575199, at *6 (M.D. Pa. Nov. 1, 2022) ("courts often begin the inquiry with this threshold factor").

In *Host*, the Third Circuit Court of Appeals cautioned that the antitrust injury requirement "challenges courts to avoid the siren songs of illusory harm." *Id.* at 252.  In *West Penn Allegheny Health System, Inc. v. UPMC,* 627 F.3d 85 (3d Cir. 2010), the court explained:  "The antitrust-injury requirement helps ensure 'that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from supporting suits by private plaintiffs for ... damages.'"  *Id.* at 101 (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990)).  The court in *Host* outlined the applicable antitrust injury analysis:

> [The court is] looking for an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant['s] acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Somewhat circular, but it means the "challenged conduct affected the prices, quantity or quality of goods or services, not just [the plaintiff's] own welfare." *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996) (quotations omitted). All of which "aims to protect competition, not competitors," consistent with the judicial gloss on the antitrust laws. *Id.* And the injury required for antitrust standing must flow from the unlawful nature of defendants' acts.

*Host*, 32 F.4th at 249-50.  The doctrine "'requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to consumers' in the relevant market."  *Id.* (citation omitted).  The *Host* opinion contained a section entitled: "Failure to Secure Preferred Contractual

Terms is Not an Antitrust Injury." *Host*, 32 F.4th at 250.  In summary, *Host* identifies two principles underlying the antitrust injury inquiry: (1) the injury must be of the type the antitrust laws were intended to prevent; and (2) the injury must flow from that which makes the conduct illegal.  A failure to secure preferred contract terms is not enough to support a finding of antitrust injury.  *Id.*

### B.  Antitrust standing is a legal question

Whether antitrust standing exists is a question of law. *Warren Gen. Hosp. v. Amgen Inc.,* 643 F.3d 77, 83 (3d Cir. 2011) (citing *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 847 (3d Cir.1996) and *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1164 (3d Cir.1993)).  *See Nahas v. Shore Med. Ctr.*, 828 F. App'x 89, 92 (3d Cir. 2020) (granting summary judgment due to insufficient evidence of an antitrust injury).  In *Host*, 32 F.4th at 252, the court affirmed dismissal with prejudice at the pleading stage for failure to allege antitrust injury.  *See SEI Glob. Servs., Inc. v. SS&C Advent*, 496 F. Supp. 3d 883, 899–900 (E.D. Pa. 2020), aff'd, No. 20-3386, 2022 WL 2356730 (3d Cir. June 30, 2022) (antitrust plaintiff must plead an antitrust injury and prove "that the challenged conduct affected the prices, quantity or quality of goods and services, not just [its] own welfare.") (quoting *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996)).

The threshold issue of antitrust standing is before the court. [7]  The court is not raising the issue of antitrust standing sua sponte.  Arconic expressly seeks summary judgment on the basis that Novelis lacks antitrust standing (ECF No. 1000).[8]  Both parties cited *Host* and discussed the

---

[7] Arconic did not challenge the existence of antitrust standing or antitrust injury at the pleading stage.  The court accepted the special master's R&R #24 (ECF No. 231) and permitted Novelis to amend its counterclaims to assert its Sherman Act § 1 theory, subject to review upon a full factual record.  (ECF No. 252).

[8] Arconic's antitrust standing argument focused on the *Illinois Brick* – direct purchaser issue.  Arconic's counsel argued at the *Daubert* motions hearing that Novelis had no antitrust injury.  (ECF No. 940 at 7).

decision in *Host*. (*See* ECF Nos. 1000 at 10; 1021 at 6; 1043 at 9). The parties did not, however, adequately address the antitrust standing and antitrust injury threshold issues identified in *Host*.[9] Novelis did not address the *AGC* factors to establish antitrust standing and it did not adequately identify its antitrust injury, as analyzed in *Host*.[10]

Upon review, the court concludes that antitrust standing is a threshold, central legal issue. The court is giving both parties fair warning it is considering that issue, as discussed in *Host*, and full opportunity to provide additional argument and evidence about that issue. *See Animal Sci. Prod., Inc. v. China Minmetals Corp.*, 34 F. Supp. 3d 465, 489 (D.N.J. 2014).

### C.  Opportunity to address these issues

The court has determined that it would be prudent to provide both sides an opportunity to adequately address these threshold legal issues. The court will deny without prejudice both parties' summary judgment motions (ECF No. 998, 1003) with respect to the Sherman Act §1 counterclaim.

Either party may file a renewed summary judgment motion with respect to Novelis' Sherman Act §1 counterclaim no later than September 8, 2023. The briefs must address the following:

1. The *AGC* antitrust standing factors, specifically including causation, the existence of more direct victims, and how the court (or jury) could fairly set the "correct" royalty amount and the "correct" price of the A951 chemical composition to determine damages;

---

[9] Given the inadequacy of the briefing, it would have been surprising if the threshold antitrust standing and antitrust injury requirements had been discussed in R&R #46.

[10] Instead, Novelis focused on Arconic's inability to establish a need for the specific price floor restraint at the second step of the "rule of reason" analysis. At oral argument on the summary judgment motions, Novelis' counsel reiterated that it was pursuing a "raising rivals costs" theory.

2. The antitrust injury principles identified in *Host* (as further discussed below); and

3. Any decisions that recognized Sherman Act § 1 claims involving similar economic realities.

In discussing its antitrust injury, Novelis' briefing and concise statement of material facts must specifically address:

(a) how its injury is of the type the antitrust laws were intended to prevent, in light of the economic realities, including that: Ford, as a condition of selecting the A951 pretreatment process, required Arconic to let its competitor, Novelis, use Arconic's A951 technology; Ford entered into long-term supply contracts with Arconic and Novelis; Ford required Arconic to commercialize its A951 technology through a third-party chemical manufacturer (i.e., Chemetall); Chemetall became Arconic's exclusive licensee and manufacturer of the A951 chemical composition;  the inclusion of Novelis as a supplier <u>increased</u> competition, in that Arconic was no longer the sole supplier of A951 pretreated aluminum; Novelis' participation <u>increased</u> output; Novelis has paid the same price for the A951 chemical composition since 2014; and Novelis received the majority of Ford's A951 aluminum business.

(b) how its injury flows from that which makes the conduct illegal, when it did not pay the contractual Target Price (i.e., the "price floor"), but negotiated a special, significantly discounted price in recognition of Novelis' role as a development partner in the commercialization process (*see* ECF No. 1151);

(c) whether Novelis' alleged antitrust injury (i.e., the difference in Chemetall's pricing to Arconic and Novelis) can be distinguished from Arconic's right to receive a royalty for its intellectual property, including it A951 chemical composition trade secret; and

(d) whether Novelis' displeasure with the details of the special price floor provision for it in the Arconic-Chemetall Agreements can be considered in isolation, without the broader economic context of Ford requiring Arconic to allow Novelis (through Chemetall) to utilize Arconic's proprietary trade secret and technology – thus increasing competition and expanding output.

The court will reserve its decision whether to refer any renewed summary judgment motions to the special master for R&R.

VI.     Conclusion

In accordance with the foregoing, Novelis' summary judgment motion with respect to Arconic's Count 2 and 4 will be granted in part (with respect to the claims relating to CI-1, CI-2 and CI-7) and denied in part (with respect to the claims relating to CI-3, CI-4, CI-5, CI-6 and whether the 23 Coil NDA was superseded by the 2012 License); and summary judgment will be granted in favor of Arconic and against Novelis on Counterclaim XII (Novelis' RPA claim).  The parties' summary judgment motions with respect to Counterclaim XI (Novelis' Sherman Antitrust Act §1 claim) will be denied, without prejudice to the parties' ability to file renewed summary judgment motions with respect to Novelis' Counterclaim XI, as described above.  The special master's R&R #46 is adopted in part and not adopted in part, as set forth in this opinion.

The summary judgment motions at ECF Nos. 988 and 1003 are granted in part and denied in part.  The only issues remaining relate to Novelis' Counterclaim XI, which may be addressed in renewed cross-motions for summary judgment.  The following matters remain for trial:  (1) Arconic's count 2 (CI-3, CI-4, CI-5 and CI-6) (nominal damages only) (advisory jury); (2) Arconic's count 4 (whether the 23 Coil NDA was superseded by the 2012 License and CI-3,

22

CI-4, CI-5 and CI-6) (nominal damages only) (jury trial); (3) Novelis Counterclaim II (wrongful termination of the 2012 License) (nominal damages only) (advisory jury); and (4) unless resolved after resolution of renewed summary judgment motions, Novelis' Counterclaim XI (Sherman Act § 1). The trial of those matters will be public.

The court will issue a case management order with respect to renewed summary judgment motions on Novelis' Counterclaim XI.

The parties shall meet and confer and notify the court by September 1, 2023, about whether a return to mediation may be productive.

An appropriate order follows.


Dated: August 25, 2023                           By the Court:

                                                 /s/ Joy Flowers Conti
                                                 Joy Flowers Conti
                                                 Senior United States District Judge